**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Sanjay Babulal Gohel,<br>Petitioner<br>-vs-<br>Charles L. Ryan,<br>Respondent. | CV-10-0001-PHX-FJM (JFM)<br><br>**REPORT & RECOMMENDATION**<br>**On Petition for Writ of Habeas Corpus**<br>**Pursuant to 28 U.S.C. § 2254** |

## I. MATTER UNDER CONSIDERATION

Petitioner, incarcerated at the time in the Arizona State Prison Complex at Phoenix, Arizona, filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on March 3, 2010 (Doc. 12). On May 17, 2010, Respondents filed their Answer (Doc. 15). Petitioner filed a Reply on August 5, 2010 (Doc. 20). Respondents filed a Supplemental Notice on July 7, 2011 (Doc. 23), and a Supplemental Answer on October 6, 2011 (Docs. 26, 27, and 28), and Petitioner filed a Supplemental Reply on October 26, 2011 (Doc. 29).

The Petitioner's Petition is now ripe for consideration. Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND
### A. FACTUAL BACKGROUND

As summarized by the Arizona Court of Appeals on direct appeal, evidence at trial showed that on four separate occasions, Petitioner tried to hire someone to kill his

1

wife, Jaimini. The first three attempts fell through, but in June 1997 Petitioner asked co-indictee Falcon, a frequent shopper in Petitioner's grocery store, to kill her. Falcon offered to find someone else to commit the murder for the $8000 offered by Petitioner. This person was Falcon's co-worker Munoz, known as "El Gato." Over the next month, Petitioner made periodic payments to Falcon and Munoz, drove them to both his home in Peoria and his wife's place of business, showed them his wife's car, invited Munoz to his grocery store at a time his wife would be there so Munoz could identify her, and provided Munoz with the handheld remote for entry to his wife's car. (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 2.)[1]

In the early morning of July 31, 1997, Munoz used the remote control to enter Petitioner's wife's car, which was parked in the driveway of Petitioner's home. He then hid under a coat in the back seat, provided by Petitioner for this purpose. When Petitioner's wife entered the vehicle to drive to work, she began backing out of the driveway. Munoz shot her twice in the head, killing her. A neighbor called 9-1-1 after hearing the noise and witnessing a Hispanic male run from the scene. (*Id.* at 3.)

## B. PROCEEDINGS AT TRIAL

Falcon and Petitioner were eventually indicted for their parts in the crime. Falcon entered into a plea agreement and pled guilty to one count of manslaughter.

Munoz was never located, and Petitioner filed, *inter alia*, a successful Motion in Limine (Pet. Exhibit 28) to prevent Falcon from testifying to statements by Munoz.

After selection of a jury, Petitioner proceeded to trial on September 27, 2000. The trial included the following testimony:

---

[1] Exhibits numbered 1 through 23 (Doc. 4) to the Original Petition (Doc. 1) (which are incorporated by reference in the Amended Petition (Doc. 12) (*see* Doc. 13 at 2)), Exhibits numbered 24 through 27 (Doc. 13) to the Amended Petition (Doc. 12), and Exhibits numbered 28 through 30 to the Reply (Doc. 21) are numbered sequentially, and are referenced herein as "Pet. Exhibit ___." Exhibits to Respondents' Answer (Doc. 15) are referenced herein as "Resp. Exhibit ____." Exhibits to Respondents' Supplemental Answer (Docs. 26, 27 and 28) are labeled _____, and are referenced herein as "Supp. Exhibit___."

**Benny Hays** – Mr. Hays testified that he was a neighbor of Petitioner, and on the morning of the shooting he was outside having coffee at about 5:30 a.m. when he heard a loud noise, walked to the end of his drive and back and heard another loud noise a minute or two later. He then saw a man, 20-25 years old, running down the street.

Then, a neighbor came and told him a lady had driven a car through a short block fence. He called 911, to report the accident. He and the neighbor, Hank, walked to the scene and saw that the car had backed across the street into the fence. The front passenger door was open, and the lady was slumped over in the driver's seat. They decided not to try to move the victim to avoid injuring her.

They went to Petitioner's house and he answered the door in his night clothes. Petitioner said he recognized the car and they walked across the street. He did not see Petitioner try to assist the driver. An officer arrived in a few minutes, and he told the officer his story. He did not think either loud noise sounded like a gunshot. He did not see any blood on the victim, and did not look closely at her. He is not familiar with the sound of gunfire, and was not certain about the elapsed time. (Supp. Exhibit I, R.T. 9/27/00 at 53-76.)

**Neil Morse** – Officer Morse testified that he responded to the scene of the shooting, and created a diagram of the scene. The car had backed across the street into a block wall. There was minimal damage to the vehicle suggesting a low impact speed. The car was in line with the driveway across the street. The victim had already been removed when he arrived. Although he responded at 6:00 a.m., he was first patrolling the neighborhood and did not arrive at the scene for several hours. (Supp. Exhibit I, R.T. 9/27/00 at 77-87.)

**Mary Stephaniak** – Officer Stephaniak testified that she was called to the scene at about 5:30 a.m., and was the first responder. About five people were standing around the car, and Petitioner flagged her down. She approached Petitioner and he said "She's my wife." Petitioner appeared concerned but not upset, and was not crying. The front passenger door was open. She checked the victim for a pulse, found a slight pulse and saw a large amount of blood. The victim's purse was on the passenger side floorboard,

and appeared undisturbed. A bag of fruit was on the passenger seat. She called for the fire department. She asked Petitioner if identification would be in the victim's wallet, and she noticed the wallet was in the purse on the top with the clasp closed. She and another officer removed the victim from the car and began CPR. Then the fire department arrived and transported her to the hospital. As they moved her and did CPR, blood spattered on the pavement and outside the car.

She spoke with Petitioner who told her the victim was going to work, and had said goodbye, but he had fallen back to sleep, until the neighbor knocked on the door. Petitioner said he had not heard anything.

The victim had a gold colored bracelet on her right wrist. She looked for a wound, but couldn't find it because of the blood matted in the victim's hair. The other officer found a bullet hole in the driver's side windshield. So, she checked the victim's hands and around her for signs that the wound was self-inflicted. She found nothing, and there was no weapon in the car.

When she first responded to the scene, she did not believe there was an emergency. Petitioner's hair was disheveled. She couldn't determine the location or nature of the victim's wound because of the blood. They did not determine the victim had been shot until the other officer arrived. Petitioner had been pacing around the car, and had not been told the victim had been shot. She requested the fire department twice, and the other officer had done so once. Petitioner had asked where the ambulance was. Petitioner had started to assist them in removing the victim, but Stephaniak stopped him. She questioned Petitioner while the ambulance crew worked on the victim, but he was unresponsive. Petitioner's father offered to answer her questions. Petitioner and his father both said they had not heard anything.

The victim was transported by helicopter. When she was put on the gurney, Petitioner began to cry, and his father had to restrain him from going to his wife. Petitioner's legs began to buckle and they sat him on the sidewalk.

Petitioner was in a T-shirt and shorts. When she told him it looked like the victim had been shot, his demeanor did not change. (Supp. Exhibit I, R.T. 9/27/00 at 88-116.)

**Douglas Maurer** - Mr. Maurer testified that his grandmother shopped at the Wittmann grocery store owned by Petitioner's father. His grandmother bought on credit, and he would borrow money from Petitioner. His sister-in-law worked for Petitioner, and he installed gravel and put in a security light for Petitioner. He had felony convictions and had problems with drugs. In late 1996, Petitioner approached him and asked what would happen if he put nitroglycerin in someone's drink, whether it would kill them. Petitioner mentioned his wife had been in a car accident and had seizures. Maurer didn't know, but agreed to find out. Petitioner later got angry with him when Petitioner heard that he was asking around about nitroglycerin.

In February, 1997, Petitioner approached him about putting a hit on his wife, because he wanted out of the marriage. Maurer suggested some ways Petitioner could kill her, and Petitioner talked about staging a robbery in Las Vegas, or hiding in her car and cutting her throat or shooting her. Petitioner brought the subject up again a week later, and they discussed Maurer following them to Las Vegas on a bus, and killing her with a knife at a motel. Petitioner was going to pay him in cash and credit. He agreed to do it for money for drugs. He talked about the plan with his brother's current wife, Tammy, and decided it wasn't smart.

In March, 1997, Maurer asked Deputy Baker about who would be believed if a businessman hired a drug addict to kill their wife. He told the officer the businessman was Petitioner, who had asked him to kill Petitioner's wife. He told defense counsel he had not identified Petitioner to Deputy Baker. The officer did not believe him. His criminal problems would have been helped by being an informant when he talked to Deputy Baker about Petitioner.

He had talked with Deputy Baker about being an informant about drug suppliers, and assumed they paid informants. But Baker's supervisors wouldn't let him become an informant. He did not think he would be paid for telling about the conversations with Petitioner.

In the spring of 1997, he was facing a criminal prosecution for escape, and a potential probation violation on a prior Georgia conviction. He had escaped from a

police car, and eventually turned himself into Deputy Baker on April 22, 1997 because officers had told his grandmother he would be shot.

Later, Petitioner brought up the subject again, suggesting Maurer use a gun, and asked him to test fire a gun. Maurer got the gun from Petitioner in May, 1997. He was supposed to kill the victim in Arizona. He was to be paid the same amount. Maurer test fired the gun and then traded the gun for drugs, telling Petitioner that he had ditched it because an officer was following him.

Petitioner found out about the gun, and banned Maurer from the store. On a later occasion, Maurer was walking past the store and he and Petitioner got in an argument over Maurer owing him for the gun. Petitioner claimed Maurer had stolen the gun.

On June 23, 1997, he was placed on probation. Within a couple of days he went on a crystal meth binge with Tammy Goad, in violation of his probation. He was home on drugs on July 2nd and July 4th, but went and bought shoes and applied for a job on July 3rd. The purchase and application documented his whereabouts on July 3, the date of the murder. He was arrested on July 7th on a probation violation, and Peoria police interviewed him, and he told them the same information. . The police officers interviewed him on July 9th and twice on July 23. Between the two conversations on the 23rd they had inspected his sneakers and when they told him they matched the imprint in the car, he refused to talk further. When he spoke with Peoria police he referred to Petitioner as a "sand nigger." In the time period he was talking with Petitioner, he would wear camouflage clothing.

He is 5 feet, 9 inches tall, and at the time of the murder he weighed about 135 pounds.

He was using crystal methamphetamine and marijuana in 1996, but only methamphetamine by late 1996, and in increasing amounts through the summer of 1997. He was suffering from anxiety, depression, and hearing voices at the time, and had attempted suicide. He was discharged from the Navy due to a personality disorder, but eventually received a disability. He would hear voices when he had been without sleep for weeks at a time.

Tammy Goad was a drug addict, and had relationships with Maurer and his brother, and would be with Maurer when he had money for drugs. She eventually married his brother.

During one of his conversations with Petitioner, Maurer recorded the conversation. He didn't take the tapes to the police because he planned to blackmail Petitioner. Tammy stole the tape recorder and tape. Tammy told him she listened to the tape and didn't hear anything incriminating on it. They had planned for him to escape to avoid his criminal problems, and Tammy would handle the blackmail. The tapes of Petitioner had recorded, but were erased by Tammy's brother.

Maurer testified he was losing money by testifying at trial. The drugs did not affect his memory, and Petitioner asked him to kill his wife in 1996 and 1997. At the time, he did not care what happened to him, whether his probation was violated. His attitude changed in 1998 when his grandmother died. He completed intensive probation, graduated college, and got into a drug treatment program.

Maurer testified he had nothing to do with the victim's murder. His conversations with Deputy Baker about the killing did not have any effect on his pending charges.

(Supp. Exhibit J, R.T. 10/2/00 at 3-135.)

**Isidro Falcon** – Mr. Falcon testified that in 1997 he weighed 199, and was five feet and five or six inches tall. He lived two blocks from Wittmann grocery. Alfonso Munoz, known as El Gato, lived 60 feet from the store, with his sister-in-law, Paula Hernandez. He had known Petitioner for about eight years, having met him at the store they owned in Surprise. He cannot read, and completed the sixth grade, and worked in agriculture and landscaping, and was working at a golf course.

About three weeks before the murder, Petitioner had started a conversation about having his wife killed. Falcon had been buying groceries on credit. Petitioner said he had a job for Falcon, who thought it was for landscaping. Petitioner said he wanted his wife killed, Falcon responded that he didn't want to do it. Petitioner asked if he knew someone who could do it. He offered $2,000, but Falcon told him the trigger man wanted more, so they discussed $8,000, $2,000 down and payments.

When he first talked with Petitioner about wanting to have his wife killed, Petitioner told him it was because she spent a lot of money when she went to California. Falcon couldn't believe he wanted to kill her. Petitioner said his wife had a disease and blamed him for giving it to her, and that he had it but blamed her.

After talking with Petitioner, he asked El Gato who claimed to have killed for money in Mexico. They discussed $2,000, but El Gato wanted $8,000. The next day, he told Petitioner that El Gato would do it. Petitioner knew El Gato.

About a week before the murder, El Gato told him that the victim was going to be killed soon. Petitioner had told him that he wanted her killed before their anniversary, when they had a trip planned to go to California.

Petitioner gave him $2,000 in cash in a white envelope, and a gun, a .380 chrome pistol with a brown handle in a holster. That same day, which was a couple of days before the murder, he gave the pistol to El Gato, and he didn't see it again. He gave El Gato the pistol to commit the murder. He gave El Gato $1,000 and Petitioner was supposed to make payments through Colin Head for the balance.

Falcon had never been to Petitioner's house. The first plan was to kill her in the parking lot at her workplace, Del Webb Hospital. Petitioner drove Falcon and El Gato there. Falcon translated for El Gato, who did not speak any English. Petitioner then decided he wanted her killed in front of his house, because he had been "burned" by Doug Maurer and Colin, who he had given stuff to kill her but they hadn't followed through. Petitioner wanted to watch through the window. He told Falcon and El Gato this while driving them to his house the Friday before the murder.

They had arranged to meet at Peter Piper Pizza in Peoria, where Falcon was taking his family. Petitioner and El Gato got him out of the restaurant, and they drove to Petitioner's house. Petitioner told them the days his wife worked, and what time she left, which was early in the morning, around 5:00 or 5:30. Petitioner gave Falcon a remote to the victim's car. Falcon gave the remote to El Gato, and Petitioner showed him how to use it. El Gato was to cover himself up with a coat in the floor of the back of the car, and kill her with the gun.

Three days before the murder, Petitioner arranged for the victim to come to the store, and then called Falcon on pretense of reviewing landscaping plans. Falcon and El Gato went to the store and saw the victim. Petitioner showed Falcon her car. Petitioner knew El Gato was to be the one to actually murder the victim.

On July 3, 1997 he got a ride to work from El Gato, arrived at 4:20 and left at about 1:00 or 1:30. On the day of the murder, El Gato was dressed in two pair of army pants, an army shirt, and had sweats and a sweatshirt on. He was wearing white tennis shoes.

He rode home with another worker. He loaned his car to El Gato and expected him to pick him up, but he never arrived. He saw El Gato later that day when it was getting dark, and El Gato said "he had done what he had to do."[1] (*Id.* at 142-149.)

The car, a 1976 Toyota, had been bought by Petitioner, and Falcon was driving it to decide whether to buy it. A week before they first discussed the murder, Petitioner sold him the car for $1,000, to be paid $100 every two weeks. Petitioner gave him the car, the key and the title. He took it to Flagstaff but it didn't have enough power so he told Petitioner he didn't want it. Petitioner insisted on the sale. In between, they discussed Petitioner wanting his wife murdered. He never paid anything on the car. El Gato had never borrowed his car before. After the murder, he told Petitioner he did not want the car because it had been used in a murder. Petitioner told him to keep it and start making the payments. He eventually sold the car.

He got another $1,000 in a white envelope from Colin, which he delivered to El Gato. El Gato threatened to come after Falcon if he ever got caught. He told El Gato that Petitioner wanted the murder done before his anniversary.

After the murder, one of Petitioner's employees, Don Mecham, took him to get the car. He paid him $5 for gas. El Gato said something to him so he knew where to find his car after the murder. The car was parked two blocks from Petitioner's house on a residential street. The car wouldn't start, so they had to jump it. The key was in the

---

[1] Objections were raised to this testimony. (Supp. Exhibit J, R.T. 10/2/00 at 149, *et seq.*)

ignition. There was a white envelope in the car. He took the car home. When he went to pick up the car after the murder, the windows were down and the key was in the ignition.

He went to talk to Petitioner the next day. Petitioner asked if everything was fine, and he said yes. He said he didn't know they were going to use his car, and he didn't want it. Petitioner told him to do whatever he wanted with it. He sold the car a couple of days later.

With the money he got, he bought his kids some clothes and put a down payment on some land. He did not finish paying for it because he was arrested on the murder in December, 1997. He was charged with murder and conspiracy to commit murder, and pled guilty to manslaughter. He was awaiting sentencing, in a range of 7 to 18 years. He agreed to testify and assist in the investigation as part of the plea agreement.

After he told Colin Head to take away the envelope with money after the murder, he did not receive anything further from Petitioner. A couple of days after the murder, El Gato came to his house and asked for money to go to Mexico. He told El Gato he had no money and he should go talk to Petitioner. He has not seen El Gato since then.

At the time of the events, he was drinking 12 to 18 beers per evening, and would smoke marijuana on a nightly basis. Before his plea agreement he was facing charges for murder and conspiracy to commit murder, and the state had filed a notice of intent to seek the death penalty.

He told his friend Ron Wallace about the murder, but discovered that Wallace had been wearing a wire and had set him up.

(Supp. Exhibit K, R.T. 10/3/00 at 9-167.)

**William Moore** – Mr. Moore testified that he had lived in Wittman, Arizona, and knew Petitioner since 1991 or 1992. Petitioner owned Wittman Grocery. Moore bought from the store and did work for Petitioner as a sign maker. He knew Petitioner's father who ran the liquor store. Moore was in prison for three years in Nevada on possession of a stolen vehicle.

In February of 1997, Moore's nephew, who worked for Petitioner, told Moore that Petitioner wanted to see him about some signs. Don Mecham lived with Moore.

Petitioner asked about Moore's legal troubles in Nevada, and then asked him "what if I needed somebody to disappear." Moore responded that nothing could be that bad.

Moore knew Isidro Falcon. In June of 1997, he saw Falcon talking with Petitioner at the store. Later in June, he saw Petitioner talking to Falcon outside by Petitioner's truck.

In December, 1997 he had a conversation with Petitioner about rumors surrounding the murder. Moore denied talking about Petitioner, and Petitioner said the rumors were told by Leslie. Moore had heard Leslie say that Petitioner had gotten Falcon to kill his wife. Moore asked Petitioner why he didn't just divorce his wife. Petitioner responded that he would lose everything if he had. Petitioner expressed a lack of trust in Falcon, and concern if Falcon was arrested and said anything, Petitioner would be harmed. He offered Moore $10,000, $5,000 for Moore and $5,000 for somebody from Nevada, to kill Falcon. Moore expressed dissatisfaction that Petitioner had involved Don Mecham, by having him take Falcon to the scene to pick up the car.

He was aware at the time of this conversation in December that the victim had been murdered, although he was in California when it occurred.

He did not report any of this to law enforcement until two weeks later, in December, 1997 when he was in jail on class two felony charges of fraudulent schemes and artifices arising in Tucson. Those charges arose out of a $100 deposit he had taken as a licensed sign painter and hadn't done the job. He expected it to be dropped to a misdemeanor, with six months sentence. He had his wife contact Detective Lopez' office. He was aware at that time that Petitioner and Falcon had been arrested. If convicted he faced the possibility of a substantial prison sentence because of his extensive prior criminal history. Those charges were dismissed after a request by the prosecutor in Petitioner's case in exchange for testimony from Moore.

In addition, theft charges from Maricopa County were dismissed along with the Tucson charges when Detective Lane said that it should be dismissed because of his cooperation. Also, a seven year old charge in Mohave County was dismissed.

At the time of trial, Moore faced probation violations in Kingman and Maricopa County. He pled guilty to another theft charge in Kingman, and was awaiting sentencing to prison or reinstatement on probation. A good word from the prosecutor in this case would be helpful to him.

He had been convicted on two counts of theft in Maricopa County, each class three felonies, and placed on probation. He faced sentencing on violation of that probation, either by reinstatement or prison sentences of up to two 8.5 year consecutive sentences. He had a total of eleven prior convictions.

He got good deals in exchange for his agreement to testify in another conspiracy/murder for hire case in Pima County. There was a verdict in that case. He violated his probation because he received a threat on his life.

He had no agreements about his current cases concerning his testimony in this case.

In March, 1998 he had a conversation with Detective Lopez about the conspiracy with regard to the Petitioner, and contrasted it to the situation in Pima County.

He believed Petitioner approached him about killing his wife and Falcon because Petitioner knew about his extensive criminal history, and he knew people who could do something like that.

(Supp. Exhibit L, R.T. 10/4/00 at 21-45; Supp. Exhibit Q, R.T. 10/16/00 at 37-75.)

**Mark Fischione** – Dr. Fischione, an employee of the medical examiner's office, testified that he had performed the autopsy on the victim, and determined that her death was a homicide, the result of two gunshot wounds to the back of her head. One shot was in an upward, right to left trajectory, hit the top of the skull and bounced back within the brain. The second shot was in the same general trajectory, but only grazed across the scalp without penetrating into the scalp. The two gunshots appeared to be from some distance other than direct contact. The soot and stippling which could indicate the range would have been caught by the victim's hair. The hair was sent for examination, but he did not do the testing or get the results. (Supp. Exhibit L, R.T. 10/4/00 at 54-85.)

**Lewis Roane** – Mr. Roane, a crime scene technician with the Peoria police department, testified that he responded to the scene. He took various pictures as directed by a detective. (Supp. Exhibit L, R.T. 10/4/00 at 86-91.)

**Robert Sanders** – Sergeant Sanders, of the Peoria police department, testified that he responded to the scene of the murder which he first believed to be the scene of an injury accident. He arrived at 5:39 a.m., and saw a vehicle that had backed into and over a small block fence. The vehicle was running and the front passenger door was open. The driver's window was halfway down, and the radio station was playing extremely loudly. Officer Stefaniak was present.

He spoke with Benny Hays and then instructed units to circulate in the area to look for a person running from the scene, giving a description of a Hispanic male wearing a green military jacket, blue pants and a white shirt, five-seven, 160 pounds.

He could see blood on the right side of the victim's head. Officer Stefaniak reported that the victim still had a pulse. They removed the victim from the car and placed her on the ground, and began performing life-saving efforts..

He noticed a bullet hole in the windshield and advised Stefaniak that they might have a gunshot victim. The bullet hole was made from the inside out. There was brain matter, hair, tissue, and blood on the inside of the windshield and dashboard. There were no signs of forced entry into the vehicle.

The fire department arrived after 15 to 18 minutes.

He looked for a gun in the vehicle, but found none. He found a charcoal black sweatshirt with silver cuffs and a sunscreen in the back of the car. In the front, there was a black purse on the front passenger floorboard, and a plastic baggie of fruit on the passenger seat. In the rear of the car there was a key and a remote control for a keyless entry or car alarm behind the passenger seat. Behind the driver's seat there was a shell casing. The purse did not look ransacked. He did not find a second shell casing.

When he first looked in the car, the victim was slumped over to the right side. When he looked in the car after determining there was a bullet hole in the windshield, he

saw a lot more blood.  At first he thought the bullet hole was bird droppings, and that the blood was from the victim hitting her head on the windshield.

    (Supp. Exhibit L, R.T. 10/4/00 at 92-116.)

**Kenneth Kowalski** – Mr. Kowalski, a criminalist with the Arizona Department of Public Safety, testified that he examined shoeprints found on the rear door panel of the vehicle with tennis shoes provided by Detective Rock.  He determined that the shoeprints could have been made by the shoes.

He examined a spent shell casing from a .380 auto cartridge case.  He also examined fragments from a spent, jacketed bullet, that could have been from a .380 or 9mm bullet.  The casing was from an auto-ejecting pistol, and had an ejector mark. (Supp. Exhibit L, R.T. 10/4/00 at 117-133.)

**Colin Head** – Mr. Head testified that in 1997 he lives in Wittmann, and worked for Petitioner at his store for seven or eight years.  He was not paid a regular wage, but would as for money if he needed it or get food or drink from the store.  He stocked, swept, and mopped.  He had met the victim at the store.

Head denied telling police or defense counsel that Petitioner had approached him about killing someone, and that he was afraid of Petitioner.  He had told Petitioner he thought his girlfriend was cheating on him and that he would hurt her if he found it was true.  Petitioner told him that was not right.

He had known Isidro Falcon for several months as of July 3, 1997.  He had seen Falcon talking to Petitioner.  He had delivered a white enveloped to Falcon sometime after July 3, 1997, as he had been told to do by Cynthia who had been contacted by Petitioner.  He delivered it to Falcon outside the store.   He told Falcon it was from Petitioner.  The envelope was thin and did not feel like it had a wad of money in it.

He had purchased two vehicles from Petitioner, one in 1996 and one in 1997. Petitioner would give him money to go to the doctor or for gas.  Head continued working for Petitioner's father at the store until it closed in 1998 or 1999 when the highway was widened.  He was at the store when Petitioner was arrested on December 15.

He did not know an El Gato or an Alfonso Munoz.

Petitioner did not come into the store until a month and a half after the murder. Head was taken into custody at the same time as Petitioner.

His statements to the police were while he was in custody, had been threatened with prison, and was scared. While he was being questioned, Falcon came in and told him that Petitioner had paid him to kill his wife, and that Head should tell the police what he knew. He told police that Petitioner had asked him to kill his wife. At first Head asserted he lied to police, but eventually claimed he told the police the truth.

(Supp. Exhibit M, R.T. 10/5/00 at 3-43.)

**<u>Don Mecham</u>** – Don Mecham testified that he suffered from cerebral palsy, had relocated from Wittmann to Oregon, and knew Petitioner from the Wittmann Grocery store. He had been working for Petitioner for about three years stocking shelves and backing, and was paid hourly wages.

He saw the victim at least once when she brought Petitioner lunch. He had known Indio Falcon for several months before the murder. He saw Falcon speaking with Petitioner.

He recognized the brown Toyota car that Falcon got from Petitioner. After July 3, 1997, Petitioner asked him to take Falcon to get the car because it had run out of gas. Petitioner and Mecham were both at the store at the time. He took Falcon to Peoria to get the car on a residential street. He did not know whether it was close to Petitioner's residence. Falcon showed him the way. Falcon started the car and drove away. He did not see Falcon use or have a key to start the car. He had taken Falcon other places.

He did not see Falcon come to the store any more after the murder.

He had seen a chrome pistol in the draw of Petitioner's desk at the store. He did not remember seeing it after the murder. After the murder, Petitioner told him to drive around town and tell him if he saw any undercover police officers or detectives. He told Petitioner that he saw new cars in town, but didn't think they were undercover cops.

After the murder, Falcon showed him a lot near Wittmann that he had purchased.

He didn't know an "El Gato." Petitioner told him he married his wife to keep his store.

15

He knew William Moore ("Tony") who he had visited in prison in California and Nevada. Tony had a daughter who died. He liked Tony.

Later, he took an officer to show him where the picked up the car, and then identified the car at an impound yard. When he spoke with the officer he took to where the car had been parked, he knew Petitioner and Colin had been arrested. He didn't remember the officer telling him anything about Tony.

(Supp. Exhibit M, R.T. 10/5/00 at 43-79.)

**Ruby Maribella** –  Ruby Maribella testified that her sister Grace was married to Petitioner's brother Ume Gohel. She was friends with Petitioner since 1990, prior to his marriage to the victim, and for at least a little while after the murder. Petitioner visited Maribella almost every weekend. She would help him buy food for his store in Wittman. They would eat together. He would come to her apartment. He had sold her cars and loaned the money for the cars to her. She paid Petitioner back on the car loans and had borrowed several hundred dollars for her mom.

In May, 1997, Petitioner called her while she was in Colorado and said he had received a letter saying his wife was having an affair. She would reach Petitioner by paging him. She would call him at the grocery store but not at home. She paged and called him daily.

Petitioner told her that the victim said that if he wouldn't sleep with her, that she would find someone else to sleep with and there was a guy named Jose at work who was interested in her. He told Maribella this after the phone call in Colorado.

(Supp. Exhibit M, R.T. 10/5/00 at 79-91.)

**Aiche Jasser** – Aiche Jasser testified that she was a clinical pharmacist at Del Webb hospital, where she worked with the victim who was a staff pharmacist. They would eat lunch together. She liked her, and they would discuss personal matters. She saw Petitioner come to the hospital once. The victim introduced him to her.

She visited the victim at home in Peoria after she was in an accident in California, which made the victim miss more than a month of work.

There was a pharmacy technician named Jose Munoz who worked at the hospital. He would walk her to her car after work.

The victim had been distraught, but just prior to the murder, the victim seemed in good spirits. She was going traveling with her husband, and seemed in good spirits in conversations about purchasing a new home. (Supp. Exhibit M, R.T. 10/5/00 at 92-104.)

**Lupe Gonzales** – Lupe Gonzales testified that she worked as a pharmacy technician at Del Webb Hospital in 1997, and knew the victim and Jose Munoz, an IV technician. The victim and Munoz were inseparable, would follow each other around the pharmacy, he would wait for her after work, and when she returned from lunch they would be sitting talking. She saw them giving each other a good bye kiss in the parking lot.

In May, 1997, she wrote a letter to Petitioner at his store telling him that his wife was seeing someone in the hospital. She didn't sign the letter or put a return address on it. She didn't think what the victim and Munoz were doing was right. She didn't write a letter to Munoz's wife because a friend spoke to Munoz.

She had met Petitioner at the hospital when he could visit the victim. He and the victim would have lunch together. The victim treated him nicely. They seemed glad to see each other. He had visited there once or twice.

She liked the victim and went and talked to her and said she should be careful about what she was doing at the hospital. (Supp. Exhibit M, R.T. 10/5/00 at 104-123.)

**Tammy Maurer-Goad** – Tammy Maurer testified that she was formerly Tammy Goad. She knows Doug Maurer and is married to his brother Dan. In 1997 she lived in Wittman, and new Doug Maurer for about two years prior to the murder. She knew Petitioner, who ran the Wittman Grocery, where she traded a lot. Doug Maurer was often in the store and would talk to Petitioner.

Indio or Isidro Falcon was her next door neighbor. He normally drove a truck, but in June of 1997 had an additional vehicle. She talked more with his wife, Catalina. Indio drank a lot.

If they didn't have money for food, Petitioner would let them get food and pay him later. They would always pay him back.

She saw Doug Maurer with a gun. He had it for about a week.

A week after she saw Doug Maurer with the gun, Petitioner told her that Doug had stolen his gun that day. She knew it wasn't that day because she had seen Maurer with the gun. She and her boyfriend Danny told Petitioner to call the police, but he said he couldn't because the gun was not registered. Petitioner seemed nervous, and had brought up the subject of the gun.

About two to four months prior to the murder, she and her husband confronted Petitioner and told him that Doug Maurer was telling people that Petitioner was trying to get his wife killed. Petitioner denied it and smiled.

At that period of time, Doug Maurer was doing drugs, but didn't have problems with his memory. He gave her a tape recorder and told her to listen to it. It was inaudible, but she is deaf in one ear. She could hear male voices but couldn't tell who they were or what they were saying. She gave it to Danny who took it to work and recorded over the tape. Doug was angry when he found out.

She applied for a job at a mobile home park on July 3, 1997. She was with Doug Maurer on that day. He also applied for a job there. They went shopping on that day, and Doug bought some shoes. It may also have been the day she got a tattoo.

She was seeing both Doug and Danny in 1997. She was addicted to crystal methamphetamine at the time. She and Doug would do drugs together. Doug had gotten out of jail in June, 1997, and they were doing a lot of drugs together. (Supp. Exhibit M, R.T. 10/5/00 at 123-147.)

**Robert Tavernaro** – Robert Tavernaro, a latent print examiner for Arizona Department of Public Safety, testified that he examined fingerprints in a black pickup truck at the scene and a blue Toyota Camry vehicle at the DPS facility, including objects in the vehicles. He also assisted with photographs, including shoeprints.

He compared the latent prints to prints of the victim, Petitioner, Babula Gohel, Doug Maurer, and Isidro Falcon. On Falcon, he had comparison prints of his entire

18

hand, including fingertips and edges of the hand. No prints of Falcon or any other known person were found in the Camry. Some prints possibly from gloves were found on the outside driver's door.

He also examined a car alarm remote, and there were no identifiable prints on it. There were no identifiable prints on any of the door handles. No prints of Falcon or Maurer were found anywhere in or on the vehicle. The failure to find a person's prints does not mean they were not in the vehicle.

He only examined the exterior of the black pickup, because that is all Detective Lopez asked him to examine. Though the comparison prints he had for Maurer were not "major case prints" he did have good enough prints to not need additional prints to eliminate Maurer.

The only identification made on the black pickup was Petitioner's print. (Supp. Exhibit N, R.T. 10/10/00 at 3-25.)

**Jose Munoz** – Jose Munoz testified that he was employed as an IV technician at Del Webb Hospital in 1997. He worked in the same department and same hours as the victim, who was a pharmacist. He also worked with Aiche Jasser, a pharmacist, and Lupe Gonzales a technician. He became friends with the victim, but only at work. They would talk about her marriage. They would talk about the pharmacy and problems she had at home. He would hold her hand when she was upset, and perhaps when he walked her to her car. They would meet when she was on her way to the parking lot and he was on break. He never kissed her, but she kissed him once on the cheek. Perhaps they touched cheek to cheek in the parking lot.

The Peoria police asked if he was having an affair with the victim. He was not and never got close to it. He met the Petitioner in the Pharmacy two or three months before the murder. The victim was upbeat about trips to California with her husband over July 4th and to Tanzania to her family. The victim and Petitioner appeared to be getting closer to each other in the time shortly before her death, and sent flowers to each other.

He knew Lupe Gonzales prior to becoming friends with the victim. After he became friends with the victim, Lupe Gonzales became more quiet toward both of them.

The victim and Aiche Jasser were friends. He was aware of the victim's car accident in California in November, 1996.

(Supp. Exhibit N, R.T. 10/10/00 at 26-39.)

**Ella McKinney** – Ella McKinney testified that she has lived in Wittmann for 20 years, and knew Petitioner who ran the grocery store. Around June 26, 1997, she sold a 1984 brown Toyota Camry to Petitioner because she needed the money. She cancelled the insurance two days after she sold the car. She sold it for 500 in cash and 200 in credit for groceries. Petitioner had given her credit at the store before, and she had paid it off.

Petitioner told her to leave the title open because he did not want it in his name. She had a door key and a gas key. Petitioner said he was buying the car for Don, and planned to sell it. She talked about it with Petitioner for about a week before selling it.

(Supp. Exhibit N, R.T. 10/10/00 at 39-46.)

**Bobby Garcia** – Bobby Garcia testified that he live in Wittmann in July of 1997, and worked at Trail Ridge Golf Course in Sun City West. He knew Isidro Falcon, but never met Alfonso Munoz or El Gato.

He bought a brown 1984 Toyota from Falcon for $1700 at the end of July, 1997. The title was in the name of Ella McKinney. He paid the full price in payments to Falcon at work or at his house, with $500 down and $200 per month. He got only one key to the vehicle. Eventually the police seized the vehicle for three days. He got it back and sold it in 1998. It was running when he sold it.

(Supp. Exhibit N, R.T. 10/10/00 at 46-53.)

**William Laing** – Officer William Laing, of the Peoria Police Department, testified that he responded to the vicinity of the scene of the murder and conducted a canvas of the neighbors and interviewed Benny Hays. When he canvased the neighborhood of the scene, he was looking for someone based on a description from Benny Hays of a Hispanic male, 20 to 25 years of age. Five seven, five eight, 160 to 170

pounds. Black hair. Wearing a pale olive green army jacket with a white T-shirt underneath, and white tennis shoes. Neat looking and possibly clean shaven. The person was in a dead run. No description of any pants was given by Hays.

He then went to the hospital to talk to Petitioner. Petitioner related that he was awake but in bed as the victim was leaving that morning. She gave him a kiss on the cheek before she left. Their normal routine was to set the alarm for 4:00 a..m. for the victim, but he usually remained in bed and left for work or the gym between 6:30 and 7:00 a.m. The victim was the primary user of the Toyota Camry vehicle she was murdered in. Her normal work days were Wednesdays off and rotating weekends.

Petitioner and the victim had gone out Wednesday night, July 2, 1997, celebrating their second wedding anniversary. The victim's sister, Bijal, went with them. The victim cooked dinner at the house and they went out to see a movie. They went in the Toyota Camry. In anticipation of a trip to California that weekend, they had the tires on the car rotated and it had been washed at a car wash.

Petitioner related that he found out about the murder when he heard the doorbell ring and answered the door to find two men who asked him if it was his vehicle and to tell him that there was a woman inside that was hurt. Petitioner said they had no children, that the victim had been hurt in a serious accident, but they planned to try to have a child within the next year.

Petitioner denied any problems with vandalism around the house. He said he was away from home most of the time.

Petitioner described the car as having an automatic transmission, and the doors automatically locked once the vehicle was started. They had an after market alarm installed on the vehicle. The victim usually kept the doors of the car locked. The day before they had used Petitioner's keys, but the victim had driven the car the prior day, and he didn't know if the doors were locked or not at the time she got in the vehicle.

On December 15, and December 16, 1997, Laing interviewed Don Mecham. His interview with Don Mecham was to find out the route he had taken. Mecham told him he had given Indio a ride only one time and that was to go get Indio's car. Mecham

never mentioned Petitioner being part of the arrangements to take Indio to his car. But Laing never asked him about any involvement by Petitioner. On the 15th, they went for a ride and Mecham showed him a route from Wittmann to near Petitioner's home, on Palo Verde. He took Mecham to the impound yard, and Mecham identified a brown car as the one that had been on Palo Verde.

Laing went to the morgue on July 3, 1997 to view the body of the victim. He examined the wounds, including a laceration on the side of her head, and an entrance wound at the back of the head. He impounded her clothing and jewelry.

Laing admitted that his report did not reflect Petitioner saying the men at his door told him about the victim being hurt. Petitioner told him that their alarm system on the car was not the most reliable, and sometimes did not work.

There was a tape recording of the interview with Petitioner that was misplaced. His written report was based on his notes during the conversation.

Laing interviewed Ruby Garcia with Sergeant Stall on about July 9, 1997. The initial interview with Ruby Garcia was at her employment, but they went to her residence.

He participated in the execution of a search warrant at the residence of Ethel Maurer in Glendale. She was the mother of Doug Maurer. They found a pair of army camouflage pants and other items that appeared to belong to a younger man rather than an older woman. .

Detective Lopez was the primary investigating officer, but task assignments were made by Sergeant Stall.

 (Supp. Exhibit N, R.T. 10/10/00 at 53-79.)

**<u>Eric Stall</u>** – Sergeant Eric Stall, of the Peoria Police Department, testified that he responded to the scene of the murder at 6:30 in the morning, and took charge of the scene. He interviewed Petitioner.

Petitioner said the victim normally left for work at 5:30 a.m., except on Wednesdays, and was employed as a pharmacist at Del Webb Hospital. He said they had a good relationship. He couldn't understand how this could happen and had no idea who

22

did it.  Petitioner showed him his truck and it was locked.  Petitioner opened it to show him something.

There was nothing to suggest that the victim's car had been broken into or that a car-jacking had been attempted.

He interviewed Lupe Gonzales, Ruby Garcia, and Colin Head.  He contacted Colin Head on December 15, 1997, and took him to the Peoria Police Department to be interviewed.  Head did not want to answer questions, and he was very direct with him to elicit responses, but was not rude or abrasive.  Indio Falcon was brought into confront Head.  At that point, Head put his head down and cried.  He then answered Stall's questions.  The interview was videotaped, but only the audio actually recorded.

Detective Lopez was the lead investigator on the case.  Lopez looked to Stall as the sergeant for assistance and advice.

When he interviewed Petitioner, he asked about guns.  Petitioner gave him a 9mm gun from his truck.

When he interviewed Lupe Gonzalez, the interview lasted 90 minutes and was not entirely amicable and he was direct with her.  When he interviewed Ruby Garcia, it was first at her employment, then at the police station, and then at her apartment.  Those interviews occurred on July 9, 1997.

On November 22, 1997, they received an anonymous phone call concerning the case which resulted in him checking into an organization called the Fourth Reich Skin Heads, and three individuals, but that information lead to nothing.

Colin Head was arrested and taken to the Peoria Police Department.  Stall wanted to have Head corroborate statements from Falcon that Petitioner had approached Head about killing the victim, and Petitioner had Head deliver an envelope to Falcon. Head initially denied any involvement.  Stall asked him to be truthful and got confrontational with Head, including screaming at him, cursing at the subject matter but not at Head, and raising his voice. He called Head a liar and told him he thought he was involved in the murder, even though Stall had no information that Head was directly involved. He told Heat that he could do eight years in prison

No recording was made of his pre-Miranda discussions with Head, which included the confrontation by Indio Falcon, Stall getting confrontational, and Head crying. Those discussions occurred over a half hour period and took a total of about 15 minutes, all prior to the Miranda warnings and tape recordings.

In that time period, he left to confirm with Indio Falcon his story. He asked Falcon to repeat his claims to Head. Falcon did so, and Head put his head down and appeared to cry. Stall then turned the recorder on, and gave Head his Miranda rights. Head then told him that Petitioner had asked him to murder his wife, and Petitioner had him deliver an envelope to Falcon.

He brought Falcon in to Head so Head would know Stall was not speculating or making up the story about Head's involvement.

He didn't record the pre-Miranda conversation because it would not be admissible. Although Head was a suspect, Stall was not certain whether Head would be a witness or a defendant. Head was released later that night. Stall had concluded there was not significant evidence of Head's involvement with the conspiracy to commit homicide.

(Supp. Exhibit N, R.T. 10/10/00 at 80-98; and Supp. Exhibit O, R.T. 10/11/00 at 3- 36.)

**William Sparpana** – Officer William Sparpana, of the Peoria Police Department, testified that he was asked to assist with surveillance via electronic listening device of conversations between Isidro Falcon and a confidential informant. Detective Lopez was interacting with Falcon. A recording was made of the conversation between Falcon and a confidential informant while they were in a trailer, and later that day in an abandoned old house. This occurred on December 11th.

On December 15th, Sparpana participated in the arrest of Petitioner at the Wittman Grocery. (Supp. Exhibit O, R.T. 10/11/00 at 36-43.)

**Thomas Stewart** – Detective Stewart, of the Peoria Police Department, testified that in this case he collected evidence, interviewed witnesses, assisted in searches and seizures, and attended the autopsy. He did not interview Petitioner.

24

He arrived at the scene of the murder at about 7:45. He collected evidence from the Camry, including a purse from the right front passenger seat. Some items in the purse were removed and separately impounded. The purse did not appear to have been disturbed.

He seized out of the back of the car an Excalibur car remote, a black sweater, and a Winchester 380 caliber auto shell casing. A 380 is a 9mm short round. He seized the key from the car.

He seized shoes from the property of Doug Maurer at the Maricopa County Jail. He had the treads compared at DPS and went to a Payless Shoe Store in Glendale where Doug Maurer claimed he purchased the shoes in the morning hours of July 3, 1997. He got a receipt signed by the store manager, reflecting purchase on July 3, 1997 at 10:24 a.m. He did not take the shoes to the store, but the manager was able to confirm the shoes from a four digit code on the shoes.

When he got to the scene, the Camry was backed up to a wall across the street from the victim's house, and the doors were opened. There was a bullet hole through the front windshield. There was broken glass on the driveway. He did not examine the glass to determine whether it was windshield glass.

At the autopsy, he impounded projectile fragments removed from the victim's head.

He participated in the search of Petitioner's home on July 17, 1997 pursuant to a search warrant. They seized various items, including a bag with brochures from Caesar's Palace in Las Vegas. There were two Excalibur car remotes that had been seized from the victim's car, one in the back and one on her key chain.

He interviewed the manager of the Payless Shoe Store and Ella McKinney. He went to Three Fountains Mobile Home Park and got a job application submitted by Doug Maurer dated July 3, 1997.

He and Detective Lopez interviewed Doug Maurer on July 9, 1997. They had a discussion for about 30 to 45 minutes, and then began recording the interview. They

returned on July 23, 1997, but Mr. Maurer refused to talk to them. They executed the warrant on the shoes the next day, July 24, 1997.

A brown Toyota Camry was seized from Bob Garcia and was taken to the impound lot, perhaps to see if certain keys worked in it.

The receipt from Payless Shoe Store was timed from 10:24 a.m. through 10:46 and the job application was dated 10:30 a.m. The Payless Shoe Store was approximately a quarter mile from the trailer park where Maurer had applied.

(Supp. Exhibit O, R.T. 10/11/00 at 43-82.)

**Juan Lopez** – Detective Juan Lopez, of the Peoria Police Department, testified that he was assigned as the case agent, and arrived at the scene at 7:00 a.m. He participated in the investigation of the scene with Officer Stewart. He observed the bullet hole in the windshield, and blood spatter, and residual particles of glass in the driveway of the home.

He observed a weapon in Petitioner's truck. It was a black, semi-automatic handgun, either 9mm or .380 caliber.

The victim had been shot in the back of the head, the car left running, keys in the car, radio on, purse undisturbed with nothing appearing to have been taken, and no indication the car had been broken into, either the doors or the trunk. There was minimal scraping damage to the car from running into the little wall. All four doors were open.

The day before his testimony he tested the remote found in the back seat of the victim's car, and the one found in the ignition, and found that they both would unlock the car. The remote found in the house would not unlock the car.

On December 16, 1997, he tested the key found in the back of the victim's car and it operated the ignition in the brown Toyota Camry sold by Isidro Falcon to Bobby Garcia, as well as opening the passenger door and hatchback door. It did not open the driver's door which appeared to be faulty.

On July 8, 1997, he received a phone message from Deputy Baker. They arranged to meet at the substation and Baker told him information about something Doug

Maurer had previously told him. He then went and interviewed Doug Maurer with Detective Stewart on July 9, 1997.

He also received information on December 8, 1997 from Detective Baker about a man named Ron Wallace. He contacted Wallace and set him up with a body wire and monitored conversations he had on December 11, 1997 with Isidro Falcon. The conversations occurred at two separate locations, and concerned the murder and Petitioner. Tapes of the conversations were made.

Wallace picked up Falcon and took him to an old mobile home that had a hard wire installed.

Wallace told Lopez where the brown Toyota Camry could be found. Lopez went to find it, but couldn't see the license plate. He went back later and confirmed the license number. It was at the home of Bob Garcia.

He interviewed Isidro Falcon on December 15, 1997. The interview was audio and video taped.

He interviewed Paula Hernandez at her home in Wittmann, Arizona on December 15, 1997, to attempt to locate her brother-in-law, Alfonso Munoz, otherwise known as El Gato. She provided a phone number in Juarez, Mexico. He tried the number then and a week before trial, and never got an answer at the number. An address was given to the U.S. Customs Service and the Border Patrol, provided photographs to them, to try to locate Munoz in Juarez, Mexico or around El Paso, Texas. Lopez did not try going to the address. They had information that Munoz might be returning to the northwest Phoenix area. The information has not panned out. No one has reported seeing Munoz around Hernandez's residence.

Paula Hernandez also provided an address for her mother, the mother-in-law to Alfonso Munoz. He could not have gotten permission to go look for Munoz in Mexico, from his department, the government of Mexico, or the United States government.

Lopez spoke with Cattie Falcon, wife of Isidro, outside her apartment in Wittmann.

He spoke with Doug Maurer with Detective Stewart. He met with him on July 9th and 23rd. After the meeting on the 9th, he got a warrant to get Maurer's shoes. Maurer was at one point considered a suspect because of shoe impressions found in the victim's car.

Although Maurer had originally waived his Miranda rights and agreed to talk with them, when Maurer expressed fear of Petitioner, started getting upset and asked why they weren't investigating Petitioner and if they were going to book him, Maurer refused to answer more questions.

Lopez later obtained information from Detective Stewart about Maurer's purchase of the shoes, and no longer considered Maurer a suspect. He believed Maurer had thrown his old shoes away.

He interviewed William Moore, Aiche Jasser, Tammy Goad Maurer, and Richard Tan, concerning the investigation. He was present for the search of Petitioner's residence. He spoke with other people as well, took inked prints from Falcon, and spoke with Petitioner.

He spoke with Petitioner on July 3, 1997. Petitioner was not arrested or in custody prior to December 15, 1997. In between those dates, Petitioner wanted to talk to him and would call. Three phone conversations were transcribed, two on July 4th and one on July 9th or 10th. The conversations were discussions. Petitioner was seeking information about what may have happened to his wife, and about her remains.

In a phone conversation on July 4, 1997, Petitioner said the doors in the victim's car did not automatically lock when you put the car in gear. There were two alarms on the car, one installed by the manufacturer, and one installed after market by someone named Joe. He said it didn't always work. There was a kill switch that would cause the engine to die a short time after someone tampered with the car. Petitioner said the victim had been in a car accident in California about a year before. Petitioner said he opened the store only one day per week, but he would arrive between 7:00 and 8:00. Unless he closed, he would leave between five and six p.m. for the 45 minute drive home. When

he closed, he would not leave until 10:00 p.m.  Petitioner said he worked a lot of hours at the store, and gave credit to people there.

He interviewed Petitioner once at the police station on July 3, 1997.  They met at Petitioner's home and they rode together in the police car.  Petitioner was not in custody and was not even particularly a suspect at that time.  Petitioner answered his questions voluntarily.  Video and audio recordings were made of the interview.  Petitioner was given his Miranda warnings.

Petitioner told him the victim left around 5:30 a.m. every morning except Wednesdays and weekends.  She worked as a pharmacist at Del Webb Hospital.  They had been married about two years.  He said he and his wife had a near perfect marriage. He said he had no idea who might have harmed his wife.

He drove Petitioner back home and they talked about Petitioner contacting him and about dealing with the media.

He spoke with Petitioner by phone on July 7, 1997, and Petitioner said services for the victim had been dealt with and said that a good friend of the victim's from her work, Jose, might have some information.  Detective Helen Rock interviewed Jose later that day.

Lopez and Petitioner continued to have conversations until July 11, when Petitioner retained counsel.

Lopez did a search of the Wittmann Grocery Store on December 17, 1997, finding papers reflecting the extension of credit by the store, primarily to store employees.  Some just reflected first names.

Petitioner denied hearing any rumors about his wife, other than that he heard around town that people said he had a hit on his wife.  He didn't inquire further, and didn't remember who told him that.

Petitioner told him he met the victim at a function at the East Indian dance festival.  He had a prior, brief, arranged marriage.  His marriage to the victim was not arranged.  The victim was of a higher caste than Petitioner, and that caused problems on both sides.  They had eloped and married in Las Vegas, Nevada, and then she returned to

29

California, and he to Arizona.  Only later did they tell their families and have a marriage in their culture.  The second marriage ceremony was a year later.  They then moved in with Petitioner's parents.  Petitioner was devoted to his father, and as the eldest son was responsible for taking care of his parents in their culture.

Petitioner mentioned to Lopez that he had noticed that when he would ride in the victim's vehicle that the passenger seat would be pushed all the way back and sometimes reclined back.  It seemed to bother him.  The discussed the possibility that the victim was going out on him, and Petitioner said it crossed his mind, but he didn't believe she would do that.  He said his heart also told him maybe, but he threw that feeling away, and he didn't want to talk about it.

Petitioner had heard rumors that someone wanted to car jack his truck.  He had a hard time in the business at first because of his skin color, but eventually got to know everybody in town and made a lot of friends.  Some got angry when he wouldn't sell to them on credit.

Based on Lopez's reconstruction of the scene and the autopsy, he believed the shooter was behind the victim, in the backseat compartment of the car, close to the center console.  A second 380 casing was found in the car when it was at the impound lot, on December 15, 1997, when the driver's seat was removed.  It was impounded by Detective Rock.  It was found under the driver's seat, closer to the rear floorboard, on the same side of the car as the other casing.

There were TV station vans at Petitioner's home on July 3, 1997, and there was newspaper and television coverage of the murder.  Channel 12 did a silent witness re-enactment. There was print coverage when Petitioner was arrested.  And Silent Witness circulated flyers, using the victim's drivers license photo. When Lopez handed three of the flyers to Petitioner on November 20, 1997, Petitioner laid them face down on his desk. Petitioner put some of the flyers up in his store.  The police department did some media releases through their Public Information Officer.

Lopez interviewed different people about potential motives.  It was suggested that there was an inability to divorce in Petitioner's culture.  Lopez did not know if Petitioner

had obtained a religious divorce to end his religious marriage to his first wife. There was information that the victim was a spendthrift, but Lopez could not corroborate that claim. There was information that there was some insurance policy, but the only one located was the one through the victim's employer in a relatively small amount. There was information about a prenuptial agreement, but the existence of such an agreement could not be substantiated. Although Falcon had told defense counsel that the victim having an affair was a motive, Falcon did not relate such a claim to Lopez. In the interim, police reports had been read to Falcon.

The taped interviews of witnesses did not contain discussions of the criminal or substance abuse histories of the witnesses.

The day before Lopez interviewed Donnie Mecham, he had talked with his close family friend, William Moore, who he referred to as his uncle. During the pre-taping discussions with Donne Mecham, Lopez did not suggest that Mecham helping in the investigation could benefit Moore. They discussed Petitioner agreeing to Mecham taking Falcon to get his car. That was different from what Mecham had previously told Detective Lang, and Lopez.

He also had pre-taping conversations with Catalina Falcon, Cynthia Gragg, Ron Wallace, and Ron Moore. On the tape, he recapped what Gragg had told him and she assented to it. Lopez disagreed that it would be better to tape all but the introductions, because witnesses are reluctant to talk on a recording until they know what they are going to be asked. He always asks witnesses to let him know if they remember anything else. Most people don't.

He was aware that Petitioner and the victim had assets which included three pieces of property in Maricopa County, her car, her insurance policy, and jewelry seized from a Bank of America vault in a search. Property settlements are commonly parts of divorces.

(Supp. Exhibit O, R.T. 10/11/00 at 83-133; Supp. Exhibit P, R.T. 10/12/00 at 3-42.)

**Catalina Falcon** – A video deposition of Catalina Falcon was played for the jury on stipulation of the parties. A transcript has not been provided. (Supp. Exhibit P, R.T. 10/12/00 at 42-44.) In the prosecution's closing argument, the testimony was described as relating that Catalina had been called by El Gato to pick him up the morning of the murder, after he left the car. (Supp. Exhibit S, R.T. 10/18/00 at 29.)

**Bijal Chollera** – The victim's sister, Bijal Chollera, testified that she was around the victim and Petitioner in July, 1997. Their family is in Mwanza, Tanzania, where they were born. Their ethnic origin is East Indian. They both came to the United States in September, 1986, settled in Phoenix and went to Phoenix College. The victim had a doctor of pharmacy degree from the University of Southern California.

Chollera had known Petitioner as an acquaintance since 1991, four years before he married the victim. She met him at a religious cultural function, his wedding reception with his first wife. She, the victim and Petitioner were Hindu, and of Indian ethnic origin. Petitioner's first wife was Indian as well.

She was aware the Petitioner and the victim had eloped and gotten married after Petitioner left his first wife. In their tradition, a divorce was integrated with western culture, and involved signing papers. If there is no civil marriage, then the parties call their families together, tell them it's not working out and they can take their daughter and her possessions back. They might do it in front of someone within the hierarchy of the society, or the cultural organization to be a witness. In the Hindu tradition, it is disfavored. It was disfavored for a woman to go with a man who left his first wife, as the victim did.

After they eloped in May, 1994, they announced their engagement. The victim was finishing her degree in California, and a year later on July 2, 1995 they got married under Hindu rituals. They then started living together. There were 6 to 8 years difference in age between Petitioner and the victim.

Petitioner and the victim lived with his parents, consistent with Indian traditions that the eldest son take care of the parents.

Chollera was in their home many times.  There was one whole room of the house dedicated to Hindu rituals.

In early 1996, the victim was in an accident on Grand Avenue with a drunk driver.  She injured her knee, had trouble walking, and needed therapy.  She was working in Phoenix at the Veterans Hospital in a pharmacy internship and residency at the time.  She recovered and was physically fine. She did not have seizures.

She obtained a settlement that she used to pay off some credit card debts she had accumulated.  She then began paying for most things by cash.  She was not a spendthrift, but continued to shop, buy jewelry, go to California and buy things.  She loved shopping and if she liked something she got it.  She had good taste, and if it cost a lot she would buy it.  She especially liked Indian jewelry, which was usually 22 carat gold.  She had traditional Indian jewelry when she got married.

In the summer of 1996, Petitioner presented the victim with a Lincoln Mark V.  Chollera didn't know how the car was paid for or who bought it.  The victim didn't want a vehicle that large.  So they bought the Camry involved in this case, using the victim's credit.

In July, 1996, the victim went to work at Del Webb Hospital, and was in an accident in November, 1996 in Los Angeles.  She was hit head on, had a head injury, lost her memory for three or four days, and was having seizures.  She was hospitalized for a few days.  Petitioner was the first person from Arizona to get to the hospital, and rented a car to driver her and Chollera back to Arizona.

Afterwards, the victim would lose her balance, needed support to walk, and had seizures.  Chollera saw her have one of these seizures at home.  She would have spit coming out of her mouth and her muscles were pulling.  She was disabled from the accident for about three months.  She took seizure medications.  She improved with therapy that lasted about a month.  But, she lost weight, lost energy, and was easily angered and seemed dazed.  She was off work for three months.  She had full medical coverage, and may have had paid time off.

During this time, Petitioner stopped paying as much attention to her and stopped spending time with her. He stopped taking her to therapy, and relied on his parents to take her. He was always at the store in Wittman. The victim preferred to have Chollera take her to therapy.

By March and April the victim was back to work, and released to drive. The victim was back to her normal self, energetic, positive, active, pleasant and nice to Petitioner. She and Petitioner began doing things more on weekend nights. Chollera would sometimes join them. The victim went to work at 5:30 or 6:00 in the morning and would get home in the middle of the afternoon. But Petitioner was gone on the weekdays and weekday evenings and weekend days. The store was open from about 7:00 a.m to 10:00 p.m., but Petitioner only worked a few evenings. They would go out in the evenings to dinner or the movies. The last month or two before she was killed, the victim was lively and vibrant.

The victim would help her mother in law in the afternoons with her catering business.

In June, 1997, Chollera noticed some kind of tenseness. They would still go out, but Petitioner would have Chollera drive and would sit in the back of her two-door car by himself. Petitioner would come home tense, and said he was stressed from work.

On July 2, 1997, Chollera had taken the victim to get her car from Discount Tire that afternoon so Petitioner and the victim could take it on a trip. The victim had prepared dinner. Then the three of them went out to go to the movies. Petitioner asked the victim to drive her car, the blue Toyota Camry. The victim seemed surprised and happy to get to drive and had to go back in to get her keys. Chollera asked him about it because it was their anniversary. Petitioner said he was tired and just wanted to sit in the back. He rode in the back seat by himself, behind Chollera.

When they returned, the victim parked the car on the left side, in front of the car port, which was filled with two cars. A truck was parked to the right. Chollera mistakenly took the victim's sunglasses, and the victim kiddingly scolded her and asked her to put them back in the car. The victim had given Petitioner the keys and remote and

34

he unlocked the car for Chollera. She opened the door, put the glasses back in the car, and closed the door. Petitioner clicked again and she heard the doors lock. The sounds of the car locking and unlocking were different. The remote did not make any sound Petitioner went in and put the keys that the victim had been using to drive with on the kitchen dining cabinet. When interviewed by defense counsel, she did not mention Petitioner locking the car. Petitioner and the victim each had their own sets of keys. Chollera didn't know if Petitioner had a set of keys to the car that evening. She did not recall Petitioner mentioning before the murder having problems with the remote, but he did mention it after the murder. She did not remember seeing both sets of keys the day before the murder.

The victim asked her to spend the night that evening, July 2nd, but Chollera wasn't able to.

The victim was anticipating a trip Petitioner had planned to Mexico via San Diego for their anniversary. It was to start on July 4th.

The victim was planning on a trip to Africa around August. It was the first time she had gone back home. Chollera had helped her with her passport. Her passport and ticket arrived the day she passed away. Chollera handled getting a refund.

Their Indian tradition calls for 13 days of hymns and mourning. Chollera only saw Petitioner cry on two occasions. Otherwise, his reaction to her death seemed to be quiet, deep thinking, dazed. On the ritual days, Petitioner would sit for a little bit where the victim's picture and a candle were.

Petitioner went through the victim's things and found a box of pictures. He only wanted the picture on the dresser from when they eloped. That disturbed Chollera. Petitioner left the picture on the dresser. The mother-in-law wanted to keep their wedding pictures. The Hindu tradition was to put a single picture of the deceased in the prayer room. The father-in-law put in the shrine a large picture of the victim from her wedding day. The picture had arrived the night before her death.

After Petitioner and the victim were married in 1994, they sent to Las Vegas from time to time for the weekend. Petitioner said they stayed at Circus Circus.

35

Chollera had nothing against Petitioner, but objected to the victim seeing him, and to their eloping without discussing it with her family. She responded to the news of their marriage by saying "you're so stupid, how could you." She objected because Petitioner had been married before, the victim was five years younger, the victim had a higher education, and Petitioner's family was from a lower caste in India. No one in the victim's family had ever married outside of their caste.

Chollera spent a lot of time at the Petitioner and victim's house, but did not live there. She was usually there three to four days a week, sometimes for more than several hours. Some of the time Petitioner was gone, but she would have dinner with them. Petitioner and his family had a sense of humor and were fun. In the week or ten days prior to the murder, she was there almost all of the time, but not constantly. She would spend some nights there.

She was aware that Petitioner and the victim had purchased some investment land in the spring and early summer of 1997, and were looking at buying a home for themselves.

Chollera graduated from Western International in June of 1997, and Petitioner and the victim had a graduation party at their home. She planned to move to Los Angeles.

(Supp. Exhibit P, R.T. 10/12/00 at 45-111.)

**Joyot Paul Chaudhuri** – Dr. Chaudhuri, professor of political science at Arizona State University, testified that he was born and educated in India until 1952, was from a Hindu background, and wrote articles and functioned as an expert in issues of Hindu and Indian culture and heritage.

Chaudhuri testified that although there is associated regret, and family pressure against it, Hindus do get divorced. There is no religious objection, but the wife usually returns to her family with different settlements being made. The caste system was used to divide people into different social functions, and eventually developed a hierarchy. It is not a legal distinction, but one of family and inter-family relationships.

Oldest sons have ritual obligations, such as cremation of the father. They have special obligations to both parents by custom. Oldest sons of oldest sons have great expectations placed on them.

Hindu families often have shrines in their homes, with different features dependent upon their sect. The rituals for different sects and castes would vary.

Marriage ceremonies may include a ceremony at the bride's home, a parade to the husband's home, and a ceremony at the husband's. Usually the bride will go to live with the husband's family. Arranged marriages are common, although increasingly the husband and wife will have met each other before the marriage.

Indian's often take their customs and Hinduism with them and continue them in a foreign country.

Daily prayer is a common tradition, but it is not ostentatious.

It is common when a death occurs to keep just a few pictures of the deceased out. The notion of death is that life goes on.

(Supp. Exhibit Q, R.T. 10/16/00 at 24-35.)

**Stipulation re Reward** – The parties stipulated that the $11,000 reward offered consisted of $10,000 from the Chollera family, and $1,000 from the Silent Witness program.

**Conclusion** - Petitioner was convicted by the jury of first degree murder and conspiracy to commit first degree murder. (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 3-4.)

After an aggravation/mitigation hearing (Pet. Exhibit 27, M.E. 10/11/01; Pet. Exhibit 29, R.T. 10/11/01), the trial court found the existence of an aggravating factor but declined to impose the death penalty, instead sentencing Petitioner to life in prison without possibility of parole on the murder charge, and life with possibility of parole after 25 years on the conspiracy charge. (*Id.* at 3-4.)

## C.  PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a notice of direct appeal.

During, Petitioner's trial, the Maricopa County Superior Court was operating under an experimental rule providing for "rapid transcripts" in all but death penalty cases. (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 17.)   Under the rule, trial transcripts in criminal appeals were computer generated, and not certified.  Counsel could request and the Arizona Court of Appeals could order a certified transcript of any portion.   (Pet. Exhibit 17, Order 4.17.)  Rapid transcripts were provided for Petitioner's appeal.

Petitioner asserted arguments on appeal that:

(1)     the use of the case detective as a bailiff violated Petitioner's right to due process and an impartial jury;

(2)     the trial judge erred in denying the motion for mistrial;

(3)     the rapid transcript rule was unconstitutional;

(4)     the sentencing statute, Ariz. Rev. Stat. § 13-703, as applied to non-capital cases, was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), etc.; and

(5)     a discrepancy in the sentencing minute entry required remand.

(Pet. Exhibit 1A, Opening Brief at i.)

In a Memorandum Decision filed March 27, 2003 (Pet. Exhibit 3), the Arizona Court of Appeals affirmed Petitioner's convictions and sentences, but modified the sentencing minute entry to remove "clearly excessive" language and orders relating to executive clemency.  (*Id.* at 22-23.)

Petitioner filed a Petition for Review (Pet. Exhibit 4), arguing: (1)  that the sentencing statute, Ariz. Rev. Stat. § 13-703, was unconstitutionally vague as applied to natural life sentences; and (3) and that under *Apprendi* he had a right to jury determination on the aggravating factors even if the sentence ultimately imposed did not exceed the statutory maximum.  The Arizona Supreme Court summarily denied review. (Pet. Exhibit 5, Order 10/29/03.)

**D. PROCEEDINGS ON POST-CONVICTION RELIEF**

On February 11, 2004, Petitioner filed an Application for Leave to File Delayed Notice of Postconviction Relief (Pet. Exhibit 7), noting that his PCR notice was due by December 31, 2003, and seeking leave to filed a delayed notice. Petitioner eventually filed, on May 13, 2005, a PCR Petition (Pet. Exhibit 8A), arguing that trial counsel was ineffective for failing to conduct an adequate investigation, and that newly discovered evidence indicated Petitioner's innocence. The State argued the petition was untimely, and failed to qualify for consideration under the exceptions to the timeliness rules. (Pet. Exhibit 8B, Response.)

The PCR Court denied Petitioner's ineffective assistance of counsel claim as delinquent, and deferred ruling on the remaining claims until completion of discovery and a motion to amend to clarify the claims. (Pet. Exhibit 9, M.E. 11/7/05.)

Petitioner then filed an Application to Amend (Pet. Exhibit 10B) and an Amended Memorandum (Pet. Exhibit 10A). The Amended Memorandum argued that the events of the shooting as related by Falcon based on Munoz's statements were inconsistent with the evidence at the scene as demonstrated by subsequent experiments by crime scene investigators, including the inability of Munoz to conceal himself in the small backseat, and to exit through the passenger front door without creating more of a blood trail. The State argued in response that the experiments were not newly discovered evidence, could have been developed with reasonable diligence, were merely impeachment and would not have altered the outcome of trial. (Pet. Exhibit 10C.)

On October 24, 2007, the PCR court adopted the State's arguments and dismissed the Petition. (Pet. Exhibit 11, M.E. 10/24/07.)

Petitioner then sought review by the Arizona Court of Appeals, challenging both the dismissal of the ineffective assistance of counsel claim and the rejection of the newly discovery evidence claims. (Pet. Exhibit 12A, PFR.) The State responded (Pet. Exhibit 12C), arguing that the PCR petition had been untimely, and Petitioner had failed to assert a claim within the exceptions to the rule. On September 26, 2008, the Arizona Court of Appeals summarily denied review. (Pet. Exhibit 13.)

Petitioner sought review by the Arizona Supreme Court (Pet. Exhibit 15A), which was summarily denied on March 17, 2009. (Pet. Exhibit 24.)

## E. OMITTED TRANSCRIPT PROCEEDINGS

On January 7, 2010, Petitioner filed with the trial court a Motion for Preparation of Omitted Transcript (Pet. Exhibit 25) arguing that the transcript of the aggravation/mitigation had not been prepared and submitted on appeal. The motion was granted. (Pet. Exhibit 26, M.E. 2/18/10.)

## F. PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing his original *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on January 4, 2010. On January 5, 2010, counsel for Petitioner appeared and filed a series of Exhibits (Doc. 4) and a Memorandum in Support (Doc. 5). Service was ordered on January 27, 2010 (Doc. 6).

Prior to an answer being filed, Petitioner filed on March 3, 2010 his Amended Petition (Doc. 12) and Additional Exhibits (Doc. 13), incorporating by reference the earlier filed Exhibits (Doc. 4).

Petitioner's Amended Petition asserts the following seven grounds for relief:

(1) **Vagueness** - "On its face and as applied to Petitioner, the Arizona statute under which Petitioner received a natural life sentence, the 1997 version of A.R.S. § 13-703, violates Petitioner's right to due process under the Fourteenth Amendment because the statute is unconstitutionally vague by providing no standards for sentencing and allows for an arbitrary application by Arizona trial and appellate judges."

(2) **_Apprendi_** - "Petitioner's right to a jury trial under the Sixth Amendment and the Fourteenth Amendments was violated because the aggravating factor that supported Petitioner's Natural Life sentence was not found by a jury as required by _Apprendi v. New Jersey_."

(3) **Rapid Transcripts** - "The refusal of the Arizona Court of Appeals to remand the case back to the trial court for transcripts certified to be accurate, edited and corrected and instead relying upon uncertified 'rapid transcripts' violated the Fourteenth Amendment's equal protection and due process clauses."

(4) **Hearsay** - "Admission of hearsay and the refusal to grant a new trial violated the rights to confrontation and the right to due process and a fair trial protected by the Sixth and Fourteenth Amendments."

(5) **Actual Innocence** - "Newly-discovered evidence exists that would have changed the verdicts and shows the Petitioner is actually innocent of the crimes. The Petitioner is being held in custody in violation of the Fourteenth Amendment."

(6) **Ineffective Assistance** - "Petitioner's right to the effective assistance of trial counsel was denied. Petitioner's trial counsel failed to adequately investigate the case, the Petitioner was prejudiced and the _Strickland v. Washington_ standard was violated."

(7) **Omitted Transcript** - "For the direct appeal, the clerk of the state trial court falsely certified as 'true and complete' an incomplete record of the trial proceedings resulting in important court filings and at least one transcript being omitted from the appellate record. The failure to submit a complete and accurate record to the state appellate court denied this indigent Petitioner a full and fair

hearing on direct appeal and in post-conviction proceedings, denied him meaningful and effective direct appellate review and postconviction review, and denied him the right to properly litigate all the issues in the case in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Rapid Transcript Experiment and selection of Petitioner's case to be included in the experimental process violated the Fourteenth Amendment's equal protection and due process clauses. Moreover, although the Superior Court Clerk was responsible for the erroneous record preparation, Petitioner alternatively argues that if the Clerk's errors alone do not warrant relief that he has in addition been subject to the ineffective assistance of counsel by the failure of his attorneys to have discovered the Clerk's omissions."

A response was ordered. (Order 4/14/10, Doc. 14.)

**Response** - On May 17, 2010, Respondents filed their Response ("Answer") (Doc. 15). Respondents concede the Petition is timely, but argue that: (a) the equal protection claims in Ground 3, and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), and 7 (Omitted Transcript) were never fairly presented to the state courts and are procedurally defaulted; (b) the claims in Ground 6 (Ineffective Assistance) are procedurally barred; and (c) the claims in Grounds 1 (Vagueness), 2 (*Apprendi*), and the due process claim in Ground 3 are without merit.

**Reply** - On August 5, 2010, Petitioner filed a Reply (Doc. 20) and Exhibits (Doc. 21). Petitioner argues that presentation to the Arizona Supreme Court is not necessary for exhaustion because Petitioner received a life sentence, and that other than Ground 7, his claims were properly exhausted and are meritorious. As to Ground 7, Petitioner requests a stay to exhaust those claims.

**Request for Stay** - On July 6, 2011, the Court noted Petitioner's request to stay these proceedings to assert additional claims in the state court. Consequently, Respondents were ordered to supplement the record to provide any subsequent state court proceedings. (Order 7/6/11 (Doc. 22). On July 7, 2011, Respondents file their Notice (Doc. 23), advising that there have been no intervening state filings.

On September 15, 2011, the undersigned issued a Report and Recommendation (Doc. 24) recommending that Petitioner's Motion to Stay (Doc. 20) be denied. That recommendation was adopted without objection on November 4, 2011 (Doc. 30).

**Supplements re Actual Innocence** – In the meantime, on September 15, 2011, the Court ordered the parties to supplement their briefs and the record to address Petitioner's assertion of actual innocence as a means to avoid his procedural defaults or procedural bars. (Order, Doc. 25.) Respondents filed their Supplemental Answer and attachments on October 6, 2011 (Docs. 26, 27, and 28). On October 26, 2011, Petitioner filed his Supplemental Reply (Doc. 29).

### III. APPLICATION OF LAW TO FACTS

**A. EXHAUSTION & PROCEDURAL DEFAULT: Grounds 3 (part), 4, 5, and 7**

Respondents argue that Petitioner's equal protection claims in Ground 3, and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), and 7 (Omitted Transcript) were never fairly presented to the state courts, his state remedies were not properly exhausted and are now procedurally defaulted, and thus these claims are barred from habeas review.

**1. Exhaustion Requirement**

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c). When seeking habeas relief, the burden is on

the petitioner to show that he has properly exhausted each claim. *Cartwright v. Cupp,* 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied,* 455 U.S. 1023 (1982).

### a. Proper Forum/Proceeding

Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court. This is true even where alternative avenues of reviewing constitutional issues are still available in state court. *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989). "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir.1999)).

The *Swoopes* decision limiting the necessity for appeal to the Arizona Supreme Court was based on state court decisions prior to Arizona's 1989 statutory amendments eliminating life-sentences from the exceptions to Arizona Court of Appeals jurisdiction. *See State v. Swoopes*, 155 Ariz. 432, 747 P.2d 593 (App. 1988). Under the version of Ariz.Rev.Stat. § 12-120.21 applicable to Petitioner, review by the Arizona Supreme Court is discretionary, even though Petitioner received a life sentence. Thus, that review is "unavailable" within the meaning of *Swoopes*, and utilization of that review is not necessary for a post-1989 life-sentence petitioner to exhaust his state remedies. *See Crowell v. Knowles*, 483 F.Supp.2d 925 (Wake, D.J., D.Ariz.2007); *Paige v. Schriro*, 648 F.Supp.2d 1151, 1168-69 (Carroll, D.J., D.Ariz.2009) (agreeing with *Crowell* ), *rev'd on other grounds sub nom Paige v. Goddard*, 409 Fed. Appx. 79 (9th Cir. 2010); and *Cofsky v. Schriro*, 2009 WL 733869 (Martone, D.J., D. Ariz. 2009) (same)..

### b. Fair Presentment

To result in exhaustion, claims must not only be presented in the proper forum, but must be "fairly presented." That is, the petitioner must provide the state courts with a

"fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim. 28 U.S.C. § 2254; *Picard v. Connor,* 404 U.S. 270, 276-277 (1971). A claim has been fairly presented to the state's highest court if the petitioner has described both the operative facts and the federal legal theory on which the claim is based. *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003) (overruled on other grounds, *Robbins v. Carey*, 481 F.3d 1143, 1149 (9th Cir. 2007)).

### c. Application to Petitioner's Claims

**(1) Ground 3: Equal Protection Claim** - Petitioner's Ground 3 challenges the refusal of the Arizona Court of Appeals to remand the case back to the trial court for transcripts certified to be accurate, edited and corrected and instead relying upon the uncertified "rapid transcripts." Petitioner contends that this violated both his equal protection and due process rights under the Fourteenth Amendment. Respondents concede that the due process claim was fairly presented on direct appeal, but contend that Petitioner never asserted an equal protection claim to the Arizona Courts. (Answer, Doc. 15 at 8-9.) Petitioner replies that the factual basis is part and parcel of the due process claim, and that the equal protection portion was fairly presented in his Opening Brief on direct appeal by quoting a portion of the Arizona case, *Matter of Hendrix,* 145 Ariz. 345, 349 (1985), which in turn cited *Griffin v. Illinois*, 351 U.S. 12 (1956). Petitioner contends *Griffin* is an equal protection case, and quoting the Arizona Supreme Court's citation of it was sufficient to raise the equal protection claim. Petitioner also contends that in the area of indigent appeals, the two clauses of the Fourteenth Amendment are interconnected. (Reply, Doc. 20 at 16-17.)

The fact that the factual basis for Petitioner's due process and equal protection claims is the same is inapposite. A claim has been fairly presented to the state's highest court only if petitioner has described *both* the operative facts *and* the federal legal theory on which the claim is based. *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003).

Nor was Petitioner's incidental quotation of *Griffith* sufficient to raise an equal protection claim. Petitioner's brief was explicitly limited to asserting a due process right under the Federal constitution.

The specific constitutional problems with rule 4.17 are that it violates a defendant's right to due process under the Arizona (art. 2, sec. 4) and Federal (5th and 14th amendments) Constitution. Furthermore, it violates a defendant's right to appeal, based on art. 2, sec. 24, of the Arizona Constitution.

* * *

This experimental rule allowing quick inaccurate transcripts in felony appeals violates numerous constitutional provisions, the due process guarantees for starters. Defendants are entitled to due process of law pursuant to art. 2, sec. 4 of the Arizona Constitution, and the Fifth Amendment of the US Constitution.

In addition, the rule violates the Arizona Constitutional right to a criminal appeal, guaranteed by Art. 2, sec. 24. What good are hard-working appellate lawyers and conscientious panels of appellate judges when the briefs are based on transcripts which are "not finally edited, corrected, or certified to be accurate."

(Pet. Exhibit 1A, Opening Brief at 13, 15.)

It is true that Petitioner included the following quotation:

Mr. Strange [a defendant] had a constitutional right to a complete and accurate transcript of the sentencing proceedings. *See Griffin v. Illinois*, 351 U.S. 12 ... (1956).
*Matter of Hendrix*, 145 Ariz. 345,349, 701 P.2d 841,845 (1985).

(*Id.* at 12.) It is also true that "for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue." *Peterson v. Lampert,* 319 F.3d 1153, 1158 (9th Cir. 2003).

However, as observed in Petitioner's Opening Brief, this was not a legal conclusion by the *Hendrix* court, but a quotation of the record below of the Arizona Commission on Judicial Qualifications. *Hendrix* involved the censure of a Superior Court judge, in part based upon "indecorous" post-sentencing comments to a defendant. In preparing the transcript for appeal, the court reporter inquired of the judge whether to include the comments in the transcript, and the judge responded it was the court reporter's decision. Ultimately, the comments were not included in the transcript. In finding the judge's conduct (both the court room comment and the instructions to the court reporter) to be violations of the Code of Judicial Conduct, the Court quoted from the Commission's findings, including the foregoing statement. The *Hendrix* court

46

engaged in no analysis of the nature of the federal constitutional rights at play, nor did it discuss any right to the transcript. It simply held: "By allowing these items to be omitted from the reporter's transcript, Judge Hendrix gave the appearance of trying to hide something." 145 Ariz. at 349, 701 P.2d at 845.

Moreover, *Griffin*, the federal case cited in Petitioner's quotation from *Hendrix* was not uniquely an equal protection case. To the contrary, *Griffin* repeatedly noted that it was proceeding on both equal protection and due process grounds.

> In this tradition, our own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system-all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'

*Griffin*, 351 U.S. 12, 17 (1956) (citations omitted).

> Consequently at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations.

*Id.* at 18. Even Justice Frankfurter's concurrence separately discussed the due process and equal protection issues at play. *Id.* at 20-21. "The [Supreme] Court also has emphasized that the holdings in the line of cases that began with *Griffin*, involving a criminal defendant's right of access to a transcript, are rooted firmly in both the due process and equal protection clauses of the fourteenth amendment." *Bundy v. Wilson,* 815 F.2d 125, 131 (1st Cir. 1987).

Had Petitioner been proceeding *pro se*, it might be tempting to conclude that the Arizona courts should have read past the plain language of his limited due process claim, and have presumed from his indirect citation of *Griffith* that he intended to assert an equal protection claim as well. However, Petitioner was represented by counsel in that brief. "When a document has been written by counsel, a court should be able to attach ordinary legal significance to the words used in that document." *Peterson*, 319 F.3d at

1159.  Here, counsel plainly and explicitly asserted only a due process claim under the Federal Constitution.[2]

Accordingly, the undersigned finds that an equal protection claim was not fairly presented in Petitioner's direct appeal, nor otherwise.  Therefore, this claim was not properly exhausted.

**(2) Ground 4: Hearsay** -   For his Ground 4, Petitioner argues that the admission of out of court statements by "El Gato" (Munoz) through Falcon violated his confrontation and due process rights.  Petitioner asserts this claim was presented on direct appeal.  (Amend. Pet. Doc. 12 at 9.)  Respondents argue that these facts were asserted in connection with a state law claim asserting an abuse of discretion in failing to grant a mistrial after the subject testimony, but it was never asserted as a federal law claim.  (Answer, Doc. 15 at 9.)  Petitioner replies that the claim was fairly presented because it was asserted at trial as a Sixth Amendment claim.

Petitioner's reliance upon federal law before the trial court is inadequate to exhaust his state remedies.  "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  The Arizona habeas petitioner "must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing." *Castillo v. McFadden*, 370 F.3d 882, 887 (9th Cir. 2004).

_____

[2]   In *Lounsbury v. Thompson*, 374 F.3d 785 (9th Cir. 2004), the court concluded that a procedural and substantive attack on a competency determination were so intertwined that the explicit presentation of one necessarily included the other.  In light of the intertwined nature of the analysis in *Griffith*, the same might be said of equal protection and due process attacks on denial of appellate transcripts.  However, the *Lounsbury* court distinguished *Peterson*'s finding of strategic choice in explicit limitations by counsel, because the state appellate rules in *Lounsbury* placed counsel in a "dilemma" of identifying every claim for exhaustion while asserting only novel claims to meet the requirements for state appellate review.  374 F.3d at 788-789.  There is no indication that Petitioner's counsel faced a similar limitation here.

Accordingly, the undersigned finds that the claim in Ground 4 was not fairly presented in Petitioner's direct appeal, nor otherwise. Therefore, this claim was not properly exhausted.

**(3) Ground 5: Actual Innocence** - In his Ground 5, Petitioner argues that he has newly discovered evidence of his actual innocence and therefore is held in violation of the Fourteenth Amendment.[3] Respondents concede that Petitioner asserted a newly discovered evidence claim to the trial court in his first PCR proceeding, but argue he did not assert it as a federal claim. (Answer, Doc. 15 at 9-10.) In his Reply, Petitioner argues that Grounds 5 and 6 (Ineffective Assistance for failure to investigate and discover the evidence) should be construed together and Ground 5 should thus not be deemed unexhausted. (Reply, Doc. 20 at 26.)

The Ninth Circuit rejected a similar argument in *Rose v. Palmateer*, 395 F.3d 1108 (9th Cir. 2005), where the court found that the petitioner did not fairly present a Fifth Amendment claim to the state courts when the claim was merely discussed as one of several issues handled ineffectively by counsel. "While [the ineffective assistance and underlying constitutional claim are] admittedly related, they are distinct claims with separate elements of proof, and each claim should have been separately and specifically presented to the state courts." 395 F.3d at 1112. The *Rose* court noted that ineffective assistance of counsel claims could be disposed of without reaching the merits of the underlying constitutional claim, if, for example, the court found no prejudice because the outcome of the trial was not affected, or that counsel had made a reasonable tactical decision to not pursue the claim. *Id.*

Here, Petitioner's ineffective assistance of counsel claim was disposed of by the state courts as untimely. (Pet. Exhibit 9, M.E. 11/7/05 at 2.) Thus, the state courts had

---

[3] Even if this claim were properly exhausted, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding...This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400-401 (1993).

no cause to examine either the merits of the ineffective assistance claim itself, nor any constitutional claim underlying it.

Moreover, Petitioner did not assert the failure to raise a Federal Due Process due process/actual innocence claim in connection with his ineffective assistance claim. Rather, he simply argued that counsel was ineffective in not discovering the evidence on which he now relies to assert an actual innocence claim. Thus, even if the Arizona courts had reached the merits of the ineffective assistance claim, they would not have thus reached the instant due process claim.

Accordingly, the undersigned finds that the claim in Ground 5 was not fairly presented in Petitioner's PCR proceeding, nor otherwise. Therefore, this claim was not properly exhausted.

**(4) Ground 7: Omitted Transcript** - In his Ground 7, Petitioner argues that his due process and equal protection rights were violated by the omission on appeal of various documents and transcripts and that appellate counsel was ineffective for failing to correct the omissions. (Amend. Pet., Doc. 12 at 12-13.) Respondents argue these claims are unexhausted and procedurally defaulted. (Answer, Doc. 15 at 11.) Petitioner concedes his state remedies were not exhausted on this claim, asserts they are not procedurally defaulted, and seeks a stay to exhaust the claims. (Reply, Doc. 20 at 29.)

Accordingly, the undersigned finds that the claims in Ground 7 are not properly exhausted.

**Summary** - Based on the foregoing, the undersigned concludes that Petitioner's equal protection claims in Ground 3 (Rapid Transcript), and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), and 7 (Omitted Transcript) were never fairly presented to the state courts, and his state remedies were not properly exhausted.

## 2. Procedural Default

Ordinarily, unexhausted claims are dismissed *without prejudice*. *Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991). However, where a petitioner has failed to

properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief. Dismissal *with prejudice* of a procedurally barred or procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts, and thus they are procedurally defaulted. Respondents generally rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a) and time bar, set out in Ariz. R. Crim. Proc. 32.4(a). (Answer, Doc. 15 at 7.)

**Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence. The Arizona Rules of Criminal Procedure do not provide for a successive direct appeal. *See generally* Ariz.R.Crim.P. 31. Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims.

**Remedies by Post-Conviction Relief** - Petitioner can no longer seek review by a subsequent PCR Petition. Under the rules applicable to Arizona's post-conviction process, a claim may not ordinarily be brought in a petition for post conviction relief that "has been waived at trial, on appeal, or in any previous collateral proceeding." Ariz.R.Crim.P. 32.2(a)(3). Under this rule, some claims may be deemed waived if the State simply shows "that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding." *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting Ariz.R.Crim.P. 32.2, Comments). For others of "sufficient constitutional magnitude," the State "must show that the defendant personally, "knowingly, voluntarily and intelligently' [did] not raise' the ground or denial of a right." *Id.* That requirement is limited to those constitutional rights "that can only be waived by a defendant personally." *State v. Swoopes* 216 Ariz. 390, 399, 166 P.3d 945, 954 (App.Div. 2, 2007). Indeed, in coming to its prescription in *Stewart v. Smith*, the Arizona Supreme Court identified: (1) waiver of the right to counsel, (2) waiver of the

right to a jury trial, and (3) waiver of the right to a twelve-person jury under the Arizona Constitution, as among those rights which require a personal waiver. 202 Ariz. at 450, 46 P.3d at 1071.[4]

Here, Petitioner's unexhausted claims do not fit within the list of claims identified as requiring a personal waiver. Nor are they of the same character. Therefore, it appears that Petitioner's claims would be precluded by his failure to raise them in an earlier proceeding.

Timeliness Bar - Even if not barred by preclusion, Petitioner would now be barred from raising his claims by Arizona's time bars. Ariz.R.Crim.P. 32.4 requires that petitions for post-conviction relief (other than those which are "of-right") be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is the later." *See State v. Pruett*, 185 Ariz. 128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that first petition of pleading defendant deemed direct appeal for purposes of the rule). That time has long since passed.

Exceptions - Rules 32.2 and 32.4(a) do not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h). *See* Ariz. R. Crim. P. 32.2(b) (exceptions to preclusion bar); Ariz.R.Crim.P. 32.4(a) (exceptions to timeliness bar). Petitioner has not asserted that any of these exceptions are applicable to his claims. Nor does it appear that such exceptions would apply. The rule defines the excepted claims as follows:

---

[4] Some types of claims addressed by the Arizona Courts in resolving the type of waiver required include: ineffective assistance (waived by omission), *Stewart,* 202 Ariz. at 450, 46 P.3d at 1071; right to be present at non-critical stages (waived by omission), *Swoopes*, 216Ariz. at 403, 166 P.3d at 958; improper withdrawal of plea offer (waived by omission), *State v. Spinosa*, 200 Ariz. 503, 29 P.3d 278 (App. 2001); double jeopardy (waived by omission), *State v. Stokes*, 2007 WL 5596552 (App. 10/16/07); illegal sentence (waived by omission), *State v. Brashier*, 2009 WL 794501 (App. 2009); judge conflict of interest (waived by omission), *State v. Westmiller*, 2008 WL 2651659 (App. 2008).

d. The person is being held in custody after the sentence imposed has expired;

e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:

(1) The newly discovered material facts were discovered after the trial.

(2) The defendant exercised due diligence in securing the newly discovered material facts.

(3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.

f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or

g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or

h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1(d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence. Here, Petitioner challenges the legality of the sentence imposed by the state court, but does not argue he is simply being held beyond the sentence actually imposed.

Petitioner contends that with regard to his claims in Ground 7 (missing transcripts), the missing records constitute "newly discovered evidence" within the meaning of paragraph (e). The plain import of this provision is not to provide post-conviction relief for any new discovery, but simply discovery of new trial "evidence." In *State v. Sanchez*, the Arizona Court of Appeals rejected a defendant's attempt to rely on paragraph (e) where a police crime lab had changed their procedures after trial. 200 Ariz. 163, 166, 24 P.3d 610, 613 (Ariz. App. 2001). The court observed: "One of the requirements for newly discovered evidence pursuant to Rule 32.1, Ariz.R.Crim.P., is

that the evidence have been in existence at the time of trial but not discovered until after trial." *Id.* at 166-167, 24 P.3d at 613-614.

Here, the omission of records did not occur until after trial, did not constitute evidence admissible at trial, and while arguably their absence might have changed the outcome of the appeal, the post-trial omission could not have "changed the verdict or sentence" Ariz. R. Crim. Proc. 32.1(e).

Moreover, the underlying records and transcripts were themselves not "discovered after the trial." At best, they were discovered by habeas counsel after the trial. But as part of the record at trial, they were known to the defense.

As to Petitioner's other unexhausted claims, where a claim is based on "newly discovered evidence" that has previously been presented to the state courts, the evidence is no longer "newly discovered" and paragraph (e) has no application.

Paragraph (f) has no application because Petitioner filed a timely notice of appeal, and as a defendant convicted at trial, was not entitled to file a "post-conviction relief of-right." *See* Ariz. R. Crim. Proc. 32.1.

Paragraph (g) has no application because Petitioner has not asserted a change in the law since his last PCR proceeding. Finally, paragraph (h), concerning claims of actual innocence, has no application to Petitioner's procedural claims. *See State v. Swoopes*, 216 Ariz. 390, 404, 166 P.3d 945, 959 (App. 2007) (32.1(h) did not apply where petitioner had " not established that trial error ...amounts to a claim of actual innocence").

**Summary** - Accordingly, the undersigned must conclude that review through Arizona's direct appeal and post-conviction relief process is no longer possible for Petitioner's unexhausted claims, and that the unexhausted claims are now procedurally defaulted.

**Remedies Through Recall of the Mandate** - Finally, Petitioner argues that he may have available a remedy through a recall of the appellate mandate. That indeed may be the case. However, Petitioner's presentation of his claim in that context would not be "fair presentation." "[W]here the claim has been presented for the first and only time in a

procedural context in which its merits will not be considered unless "there are special and important reasons therefor,". . .that "does not, for the relevant purpose, constitute 'fair presentation.' " *Castille v. Peoples,* 489 U.S. 346, 351 (1989).

It is true that actual consideration of the merits of a federal claim by the state courts, even if the claim were not fairly presented, would result in exhaustion. *See Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir.1984) ("[t]here is no better evidence of exhaustion than a state court's actual consideration of the relevant constitutional issue"). However, this Court is not faced with such actual exhaustion. The mere possibility for such a review of the merits does not avoid the effect of Petitioner's current technical exhaustion and procedural default.

**Summary re Procedural Default** - Petitioner failed to properly exhaust his state remedies on the federal claims in Petitioner's equal protection claims in Ground 3 (Rapid Transcript), and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), and 7 (Omitted Transcript), and is now procedurally barred from doing so. Accordingly, these claims are procedurally defaulted, and absent a showing of cause and prejudice or actual innocence, must be dismissed with prejudice.

## B. INDEPENDENT AND ADEQUATE STATE GROUNDS: Ground 6

In his Ground 6, Petitioner argues that he received ineffective assistance of counsel at trial, when counsel failed to adequately investigate so as to discover the physical impossibility of the crime as described by Falcon (as suggested in the expert testimony submitted by Plaintiff in support of his claims of actual innocence). Respondents argue this claim was presented in Petitioner's first PCR petition and was found to be precluded because untimely under Ariz. R. Crim. Proc. 32.4. Accordingly, Respondents argue that it was disposed of on an independent and adequate state ground and is barred from habeas review.

Petitioner replies that Arizona's time bar is not adequate to bar federal habeas review because it is not regularly applied. Petitioner argues that the rule is not regularly applied because the rule is discretionary, and Arizona courts "consistently use discretion

and either grant or deny permission to file late." (Reply, Doc. 20 at 28.) In support of his argument, Petitioner cites *State v. Pope,* 130 Ariz. 253, 635 P.2d 846 (1981). In that case, the Arizona Court determined that the time limits for a motion for rehearing under Ariz. R. Crim. Proc. 32.9 is not jurisdictional, and a court may allow a late filing. Petitioner points to no Arizona authority extending *Pope* to late PCR notices under Rule 32.4(a).[5] The undersigned has found no cases extending *Pope* to Rule 32.4(a).[6]

Nor did Petitioner provide any authority other than *Pope* in the PCR proceeding. (*See* Pet. Exhibit 7, Mot. Delayed Notice at 3; Pet. Exhibit 12A, Pet. Rev. at 9-12; Pet. Exhibit 15A, Pet. Rev. at 6-9.) The PCR Court concluded that *Pope* did not extend to subsequently enacted time limits in Rule 32.4(a), and found that in *Moreno v. Gonzalez*, 192 Ariz. 131, 962 P.2d 205 (1998) the Arizona Supreme Court "implicitly confirmed that the time limits in Rule 32.4 are mandatory and may not be waived by the trial court." (Pet. Exhibit 9, M.E. 11/7/05 at 2.) The Arizona Court of Appeals and Arizona Supreme Court summarily denied review. (Pet. Exhibit 13, Order 9/26/08; and Pet. Exhibit 14, Order 10/29/03.)

At best, Petitioner now points to *State v. Aaron*, 2008 WL 2623946 (Ariz. App. 2008) where the Arizona Court of Appeals faced a PCR petition filed 17 months after the appeal was denied. The court observed in a footnote: "As the record before us contains no notice, only Aaron's petition, we cannot determine whether Aaron did or did not file a timely notice." *Id.* at *1, n 1. Nonetheless, the Court proceeded to address the merits. "Because the trial court considered his claims on their merits, however, we exercise our discretion to do likewise in considering his petition for review." *Id.* Thus the court in *Aaron* did not conclude that the Arizona courts have discretion to ignore Rule 32.4(a)'s

---

[5] Petitioner does cite the unpublished decision in *Barrandez v. Callahan*, 1999 WL 426403 (9th Cir. June 3, 1999) for the proposition that *Pope* has been generally extended to all time limits under Arizona's Rule 32. (Reply, Doc. 20 at 28.) However, *Barrandez* did not apply *Pope* to a PCR notice under Rule 32.4(a), but to a motion for rehearing under Rule 32.9

[6] In the unpublished decision in *State v. Bann*, 2010 WL 1493109, *2 (Ariz.App. 2010), the court relied on *Pope* to permit a late PCR *petition*.

time limit, but they had the discretion to address the merits of a petition review where the potential for a violation of Rule 32.4(a) appeared from the bare record, but it had not been argued or addressed.  That is a far different thing from finding a violation, and then finding the discretion to ignore it.

The plain language of Rule 32.4(a) belies any such discretion.  The rule provides: "Any notice not timely filed may only raise claims pursuant to Rule 32.1(d), (e), (f), (g) or (h)."[7]  While Rule 32.4(c) permits extensions to the time for filing petitions, no similar authority is granted for PCR notices.  Petitioner points to not a single instance in which an extension of the time line under Rule 32.4(a) has been granted, or the failure to comply with it waived.

Moreover, even if *Pope* extends to Rule 32.4(a) , and the rule permitted discretionary exceptions, that does not render the rule inadequate.

> The mere fact that a state's procedural rule includes an element of discretion does not render it inadequate...So long as standards governing the exercise of discretion are firmly established and are consistently applied, a state's procedural rule will be adequate to bar federal claims.

*Fields v. Calderon,* 125 F.3d 757, 762 (9th Cir. 1997).  The *Pope* rule includes standards to govern the state court's exercise of discretion.

> In so holding, we would remind the bench and bar that the party asserting a valid reason for non-compliance with the time requirements has a heavy burden in showing the court why the non-compliance should be excused. Mere inadvertence or neglect on the part of a party will not be considered a valid reason for allowing a party to avoid the strict time limits of Rule 32.

*Pope*, 130 Ariz. at 256, 635 P.2d at 849.

---

[7]   Ariz. Rev. Stat. § 13-4234, which is the statutory authority for PCR proceedings, and contains its own recitation of the 30 day time limit explicitly provides: "The time limits are jurisdictional, and an untimely filed notice or petition shall be dismissed with prejudice."  Ariz. Rev. Stat. § 13-4234(G).  *But see State v. Fowler*, 156 Ariz. 408, 752 P.2d 497 (App. 1987) (finding prior version of §13-4234 unconstitutional as an invasion of court's rule making power.

In *Bennett v. Mueller*, 322 F.3d 573 (9th Cir.2003), the Ninth Circuit specifically addressed the burden of proving the adequacy of a state procedural bar.

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

*Bennett*, 322 F.3d at 584, 585.

Petitioner has failed to cite any authorities demonstrating inconsistent application of Rule 32.4(a), or to assert factual allegations showing the rules inadequacy. Accordingly, Petitioner has failed to meet his threshold burden, and the undersigned concludes that Rule 32.4(a) is adequate to bar federal habeas relief.


## C. CAUSE AND PREJUDICE

If the habeas petitioner has procedurally defaulted on a claim, or it has been procedurally barred on independent and adequate state grounds, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984). Although both "cause" and "prejudice" must be shown to excuse a procedural default, a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).

"Cause" is the legitimate excuse for the default. *Thomas*, 945 F.2d at 1123. "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting *Reed*, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990). The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Here, Petitioner does not show any good cause to excuse his failures to exhaust.

To be sure, Petitioner argues that appellate and/or PCR counsel should have asserted various claims. However, to constitute cause to excuse a procedural default, deficient performance by counsel must constitute an independent constitutional violation. *Ortiz v. Stewart*, 149 F.3d 923, 932, (9th Cir. 1998). In *Patrick Poland v. Stewart*, 169 F. 3d 573 (9th Cir. 1999), the Ninth Circuit held that "[b]ecause there is no right to an attorney in state post-conviction proceedings, there cannot be constitutionally ineffective assistance of counsel in such proceedings." *Id.* at 588 (quoting *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)).

Moreover, a claim of ineffective assistance of counsel showing "cause" is itself subject to the exhaustion requirements. *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Edwards v. Carpenter*, 529 U.S. 446 (2000). Accordingly, "[t]o the extent that petitioner is alleging ineffective assistance of appellate counsel as cause for the default, the exhaustion doctrine requires him to first raise this ineffectiveness claim as a separate claim in state court." *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988). Petitioner has not exhausted a claim of ineffective assistance of appellate counsel or PCR counsel.

It is true that in *Maples v. Thomas*, - - - U.S. - - -, 2012 WL 125438 (Jan. 18, 2012), the Supreme Court held that cause could be shown when post-conviction counsel was not merely negligent (and under the law of agency that negligence being chargeable to the petitioner) but had abandoned the representation without notice to the petitioner, resulting in the loss of his state remedies. Here, however, Petitioner does not suggest that counsel abandoned the representation, merely that counsel was deficient. Thus, any such deficiency was not external to the defense, and is chargeable to Petitioner.

Petitioner also complains about the omission of records and transcripts on appeal. However, Petitioner also alleges that those omissions should have been discovered by effective appellate counsel. Again, no such claim has been exhausted.

Finally, Petitioner asserts cause to excuse his late PCR filing by arguing that the 30 day time limit applied to PCR proceedings "is very short and was triggered by the mandate of the appellate court that was never sent to Petitioner." (Reply, Doc. 20 at 28.) Petitioner further argues that appellate counsel rendered ineffective assistance when he misinformed Petitioner's family that a 90 day time limit applied, not a 30 day time limit. (*Id.*) All of this except the shortness of the time period amounts to another assertion that Petitioner's claim is procedurally barred because of the ineffective assistance of appellate counsel. However, Petitioner's state remedies on his claims of ineffective assistance of appellate counsel have not been exhausted.

As to the shortness of the time period, Petitioner does not assert that this was the cause of his delinquency, but rather it was his reliance on appellate counsel's misinformation. Petitioner does not allege, for example, that he diligently sought to file within the 30 days but was unable to meet the time period. Moreover, even if this Court were inclined to find 30 days to institute a PCR proceeding too short (a conclusion potentially disruptive of countless comparable time limits in federal and state jurisprudence) the time limit is only for the filing of a PCR notice, which requires little more than basic procedural information, with the PCR petition not due for at least 60 days thereafter. *See* Ariz. R. Crim. Proc. 32.4; and *Isley v. Arizona Dept. of Corrections*, 383 F.3d 1054 (9th Cir. 2004).

Accordingly, the undersigned finds no basis for a finding of "cause."

**Miscarriage of Justice / Actual Innocence** - The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice." *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986). Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S.

478, 496 (1986) (emphasis added). Although not explicitly limited to actual innocence claims, the Supreme Court has not yet recognized a "miscarriage of justice" exception to exhaustion outside of actual innocence. *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc.*, §26.4 at 1229, n. 6 (4th ed. 2002 Cumm. Supp.). The Ninth Circuit has expressly limited it to claims of actual innocence. *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

However, in *Dretke v. Haley*, 514 U.S. 386 (2004), the Court held that "a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default." *Id.* at 393-394. Accordingly, the undersigned defers addressing the actual innocence claim until the merits of the remaining undefaulted claims are addressed.

## D. GROUND 1: VAGUENESS

In his Ground 1, Petitioner argues that on its face and as applied to Petitioner, the Arizona statute under which Petitioner received a natural life sentence, the 1997 version of A.R.S. § 13-703, violates Petitioner's right to due process under the Fourteenth Amendment because the statute is unconstitutionally vague by providing no standards for sentencing and allows for an arbitrary application by Arizona trial and appellate judges.

Respondents argue that the Arizona Court of Appeals rejection of this claim on direct appeal was not contrary to nor an unreasonable application of applicable federal law, but was a reasonable application of the decision in *Hamelin v. Michigan*, 501 U.S. 957, 994 (1991). (Answer, Doc. 15 at 12-13.)

Petitioner replies that the Arizona Court of Appeals wrongly focused on the "fair warning" flavor of vagueness, and ignored his sole argument based upon the "arbitrary application" flavor and thus misapplied federal law.

**Limits of Habeas Relief** - While the purpose of a federal habeas proceeding is to search for violations of federal law, not every error justifies relief. "[A] federal habeas

61

court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24- 25 (2002) (*per curiam*). To justify habeas relief, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted. 28 U.S.C. §2254(d)(1).

**Arizona Court's Decision** - On direct appeal, Petitioner argued:

> In 1993, [Ariz. Rev. Stat. §] 13-703 was amended to its current form. It states that a defendant convicted of first degree murder will receive one of three specified sentences: death, natural life in prison, or 25 years in prison. The death sentencing provisions of 13-703 are not at issue in this appeal.
>
> The problem with ARS 13-703 is that it gives the trial judge no standards to use in determining whether to impose the 25 year sentence or natural life.
> * * *
> A previous vagueness challenge to ARS 13-703 argued the general vagueness argument, that ARS 13-703 cannot be understood.
> * * *
> The appellant is making a different vagueness argument...
> * * *
> Instead, we have a criminal law which states two different punishments, one far more severe than the other, with no standards to guide the trial judge in determining which sentence is appropriate.

(Pet. Exhibit 1A, Opening Brief at 16, 18-19.)

In disposing of this claim, the Arizona Court of Appeals observed that in *State v. Wagner*, 194 Ariz. 310, 311, 982 P.2d 270, 271 (1999) the Arizona Supreme Court had disposed of a challenge to the statute based on a lack of fair notice. The appellate court went on to observe, however, that *Wagner* had also rejected a claim that the Constitution required sentencing guidelines to assist judges in selecting among sentencing options (with the exception of the death penalty). Appellate counsel had conceded at oral argument that *Wagner* was controlling law on the issue, and the appellate court relied upon it to dispose of the claim.

**Mandate for Sentencing Guidelines** - Petition argues that the Arizona court's decision was an unreasonable application of federal law because: (1) it relied on *Harmelin*, which is a cruel and unusual punishment case not concerned with vagueness; and (2) the court incorrectly applied the "fair warning" standards to an "arbitrary application" claim.

Applicability of *Harmelin* - In *Harmelin*, the Supreme Court rejected a cruel and unusual punishment challenge to a mandatory natural life sentence which was based upon the disproportionality of the sentence and the lack of consideration of mitigating factors. With regard to the latter, the Court refused to extend its "individualized capital sentencing doctrine" to a mandatory natural life sentence. 501 U.S. at 995-996.

In Petitioner's case, the Arizona Court of Appeals did not directly rely upon *Harmelin*, but simply acknowledged that the Arizona Supreme Court's opinion in *Wagner* had relied on *Harmelin*. (Pet. Exhibit 1A, Mem. Dec. 3/27/03 at 5.) The appellate court found itself bound by the holding of *Wagner* and in reliance on it disposed of Petitioner's claim. *Wagner*, in turn, addressed the substance of the due process challenge to a standard-less imposition of a life sentence:

> Because appellant has no constitutional right to sentencing guidelines in a non-capital proceeding, the lack of guidelines for imposing a sentence of life or natural life does not violate appellant's right to due process or equal protection under the law. *See Harmelin*, 501 U.S. at 994, 111 S.Ct. at 2701 (rejecting a claim that the Constitution requires a state "to create a sentencing scheme whereby life in prison without possibility of parole is simply the most severe of a range of available penalties that the sentencer may impose after hearing evidence in mitigation and aggravation"); *United States v. LaFleur,* 971 F.2d 200, 211-12 (9th Cir.1991) (holding that the Constitution does not require an individual assessment of the appropriateness of a life sentence).

*Wagner*, 194 Ariz. at 313-314, 982 P.2d at 273-274.

Thus, *Wagner,* and consequently the Arizona Court in this case, improperly relied upon the Eighth Amendment decision in *Harmelin* to reject a due process/vagueness challenge to a sentencing statute.

However, the Arizona Courts' erroneous application of *Harmelin* does not automatically justify relief. Rather, Petitioner is entitled to relief only if the Court's decision is "contrary to or an unreasonable application of" Supreme Court law.

<u>Contrary To</u> - The Arizona Court of Appeals' decision was not contrary to Supreme Court law.

The Supreme Court has instructed that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).

Here, the rule applied did not contradict Supreme Court law. Petitioner points to no Supreme Court law which holds that the vagueness doctrine of due process precludes unguided judicial selection between various non-death penalty sentences. The last time the Supreme Court addressed any similar due process claim was in *McGautha v. California*, 402 U.S. 183 (1971).

In *McGautha,* the Supreme Court addressed sentencing statutes, not under the Eight Amendment's ban on cruel and unusual punishment, but under the vagueness mandate of the Due Process Clause.

> We consider first McGautha's and Crampton's common claim: that the absence of standards to guide the jury's discretion on the punishment issue is constitutionally intolerable. To fit their arguments within a constitutional frame of reference petitioners contend that to leave the jury completely at large to impose or withhold the death penalty as it see fit is fundamentally lawless and therefore violates the basic command of the Fourteenth Amendment that no State shall deprive a person of his life without due process of law.

402 U.S. at 208. The Court ultimately rejected the claim:

> In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the

untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution.

*Id.* "The Court refused to find constitutional dimensions in the argument that those who exercise their discretion to send a person to death should be given standards by which that discretion should be exercised." *Furman v. Georgia,* 408 U.S. 238, 247 (1972).

Just one year after *McGautha*, the Court decided in *Furman* that a standards-less imposition of the death penalty was a violation of the Eight Amendment. In reliance on *Furman*, the Court vacated the judgment in *McGautha*, and remanded it for consideration under *Furman*. *Crampton v. Ohio*, 408 U.S. 941 (1972). "Thus, what had been approved under the Due Process Clause of the Fourteenth Amendment in *McGautha* became impermissible under the Eighth and Fourteenth Amendments by virtue of the judgment in *Furman*." *Lockett v. Ohio*, 438 U.S. 586, 599 (1978). *See also Ford v. Wainwright*, 752 F.2d 526, 534, n. 7 (1985), overruled on other grounds, 47 U.S. 399 (1986) ("*McGautha* ...was decided on the basis of the Fourteenth Amendment and not on Eighth Amendment grounds. In *Furman*...the Court recognized and began to explicate the Eighth Amendment parameters of capital sentencing."). Here, not only does Petitioner not assert an Eight Amendment claim, but he was not subjected to a death penalty.

Petitioner points to no Supreme Court decision since *McGautha* which adopts a contrary conclusion under due process, either as to death penalty cases or in the less formidable context of less-than-death sentences. The undersigned has found none.

Nor has Petitioner shown that the Arizona Court confronted "a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[d] at a result different from [its] precedent." *Lockyer*, 538 U.S. at 73. Indeed, *McGautha* is the closest due process case, and the Arizona decision arrived at the same result.

Unreasonable Application - Nor has Petitioner shown that the Arizona decision was an unreasonable application of Supreme Court law.

Distinguishing between an unreasonable and an incorrect application of federal law, the Court in *Williams v. Taylor*, 529 U.S. 362 (2000) clarified that an incorrect

application is insufficient to justify relief. Distinguishing between an unreasonable and an incorrect application of federal law, the *Williams* Court clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. *Id.* at 410-411. "A state court's decision can involve an "unreasonable application" of federal law if it either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Anthony v. Cambra,* 236 F.3d 568, 578 (9th Cir. 2000).

The first branch - correct rule, unreasonable application - -doesn't apply. The Arizona Court simply selected the wrong rule.

The second branch - unreasonable failure to apply rule in new context - - doesn't apply either. In this regard, it is important to remember that "it is the state court's decision, as opposed to its reasoning, that is judged under the 'unreasonable application' standard." *Merced v. McGrath*, 426 F3d 1076, 1081 (9th Cir. 2005). Here, the Arizona court's reasoning was flawed - - it chose the wrong precedent - - but there is no clearly established Federal law that was applicable and called for a decision different from that reached by the Arizona court. Indeed, *McGautha* mandated the very decision they reached.

Thus, despite the erroneous reliance on *Harmelin*, the Arizona court's decision was neither contrary to nor an unreasonable application of Supreme Court law.

"Fair Warning" v. "Arbitrary Application" - Finally, Petitioner argues that§ 2254's limitation on habeas relief is met because the Arizona court improperly applied a "fair warning" analysis to Petitioner's "arbitrary application" claim.

As recognized in *Anderson v. Morrow*, 371 F.3d 1027 (9th Cir. 2004), the due process proscription of vague statues encompasses both a "notice test" and an "arbitrary enforcement test." The "notice test" is concerned with whether "the statutory language is 'sufficiently precise to provide comprehensible notice' of the prohibited conduct." *Id.* at 1032. The "arbitrary enforcement test" is concerned with the kind of statute that "does

not provide explicit standards to those who apply them, so as to avoid arbitrary and discriminatory enforcement." *Id.*

Here, the Arizona Court of Appeals' decision quoted those portions of *Wagner* that focused on notice, *i.e.* that "a person of ordinary intelligence can easily determine the range of punishment he or she faces for committing first degree murder." (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 5 (quoting *Wagner*, 194 Ariz. at 313, 982 P.2d at 273).)

To the extent that the Arizona court failed to address the issue raised by Petitioner (e.g. arbitrary enforcement), it's decision could be considered erroneous or even unreasonable.

However, Petitioner fails to offer any Supreme Court precedent which extends the vagueness prohibition against arbitrary enforcement to the sentencing context.

Petitioner points to *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) for the proposition that the vagueness doctrine prohibits statutes that lack "explicit standards for those who apply them." (Reply, Doc. 20 at 10.) However, *Grayned* was not concerned with discretion in sentencing, but in prosecution decisions under a disturbing-the-peace statute. Petitioner points to no cases extending the vagueness doctrine past the prosecution stage to sentencing.

Ninth Circuit jurisprudence indicates that the Supreme Court has never done so. For example, in *Bradway v. Cate*, 588 F.3d 990 (9th Cir. 2009), the Court noted the inapplicability of the Eighth Amendment vagueness jurisprudence to a life sentence, and concluded that no Supreme Court cases had addressed due process vagueness claims based upon a failure to narrow offenses subject to more severe penalties, where the penalties were less than the death penalty. *Id.* at 992-993. In *U.S. v. Johnson*, the Ninth Circuit observed that "[u]nconstitutional vagueness challenges to the Sentencing Guidelines have been questioned as theoretically unsound." 130 F.3d 1352, 1354 (9th Cir. 1997) (citing *U.S. v. Wivell*, 893 F.2d 156, 159-60 (8th Cir. 1990) (vagueness doctrine does not mandate sentencing guidelines). As recently as 2006, the Ninth Circuit was required to simply assume "that a vagueness argument focused exclusively on

sentencing, rather than on criminal conduct giving rise to the sentence, is cognizable." *U.S. v. Hungerford*, 465 F.3d 1112 (9th Cir. 2006).

Again, because Petitioner fails to show that there is Supreme Court law that mandates relief, this Court cannot find that the Arizona court's decision to deny relief was "contrary to or an unreasonable application of" such law.

Therefore, Petitioner's Ground 1 is without merit and must be denied.

## E. *APPRENDI*: Ground 2

In his Ground 2, Petitioner argues that his right to a jury trial under the Sixth Amendment and the Fourteenth Amendments was violated because the aggravating factor that supported Petitioner's natural life sentence was not found by a jury as required by *Apprendi v. New Jersey*. (Amend Pet., Doc. 12 at 7.) Respondents argue that no fact was necessary to be found to justify the judge's choice between a natural life sentence and a life sentence with possibility for parole. (Answer, Doc. 15 at 13-14.) Petitioner responds that to avoid being unconstitutionally arbitrary, the judge's choice must be supported by an aggravating factor, and that the only ones authorized are those in Ariz. Rev. Stat. § 13-703(F).

Petitioner's claim is without merit.

*Apprendi* mandated that: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466 at 490.

The applicable statute provided:

> A. A person guilty of first degree murder as defined in § 13-1105 shall suffer death or imprisonment in the custody of the state department of corrections for life as determined and in accordance with the procedures provided in subsections B through G of this section. If the court imposes a life sentence, the court may order that the defendant not be released on any basis for the remainder of the defendant's natural life. An order sentencing the defendant to natural life is not subject to commutation or parole, work furlough or work release. If the court does not sentence the defendant to natural life, the defendant shall not be released on any basis until the completion

of the service of twenty-five calendar years if the victim was fifteen or more years of age and thirty-five years if the victim was under fifteen years of age.

Ariz. Rev. Stat. § 13-703(A) (1999). The plain import of this statute is that outside a death penalty (which did require fact finding on aggravating factors) the judge was required to sentence the first degree murder to life in prison, but had discretion to designate it as with or without parole. The statute provided no prerequisites to exercising that discretion. "In Ariz. Rev. Stat. § 13-703(A), the Arizona legislature explicitly authorizes a sentence of natural life upon a conviction for first degree murder without the need for any further factual findings." (Pet. Exhibit 3, Mem. Dec. 3/2703 at 11.)

"The Sixth Amendment does not prevent judges from 'exercis[ing] discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment within the range prescribed by statute.' " *Butler v. Curry,* 528 F.3d 624, 643 (9th Cir. 2008) (quoting *Apprendi,* 530 U.S. at 481).

We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. ...For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

*U.S. v. Booker,* 543 U.S. 220, 233 (2005).

Petitioner attempts to bring the statute within the ambit of *Apprendi* jurisprudence by arguing that the statute would be unconstitutional if some limits on discretion were not read into the statute. This claim has been rejected in connection with Petitioner's Ground 1 (vagueness).

Moreover, even if Petitioner could make out such a claim, it would not permit a bootstrapping of an *Apprendi* claim. The sentencing statute would simply be void for vagueness.

Even if the statute were not simply void for vagueness, Petitioner proffers no rationale for his assumption that the limits that would be inscribed would be those that required specific factual findings, let alone the factors in § 13-703(F), which are

69

referenced in the subsection solely as those which the sentencing court "shall consider." The only mandate for a finding of such an aggravating factor is as a condition of imposing "a sentence of death."  Ariz. Rev. Stat. § 13-703(E) (1999).

This claim is without merit.

## F.  DUE PROCESS AND RAPID TRANSCRIPTS: Ground 3 (part)

For his Ground 3, Petitioner argues that the refusal of the Arizona Court of Appeals to remand the case back to the trial court for transcripts certified to be accurate, edited and corrected and instead relying upon uncertified "rapid transcripts" violated the Fourteenth Amendment's due process clause.[9]  (Amend. Pet. Doc. 12 at 8.)  Respondents argue that the Arizona courts properly rejected this claim based on the absence of any prejudice.[10]  (Answer, Doc. 15 at 15.)  In reply, Petitioner simply argues that he had a Due Process right to certified transcripts, and the rapid transcripts were erroneous.

Petitioner's assertion of a right to a transcript is founded upon  *Mayer v. Chicago*, 404 U.S. 189 (1971), and its predecessor *Griffin v. Illinois*, 351 U.S. 12, 18 (1956), which mandate provision of trial transcripts to indigents for appeal.  Failure to provide perfect or complete transcripts is not, however, a *per se* denial of due process.  Rather, some specific prejudice must be shown by Petitioner. *See Bransford v. Brown*, 806 F.2d 83, 85-86 (6th Cir. 1986),  *cert. denied*, 481 U.S. 1056 (1987).  *See also U.S. v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994) (applying 28 U.S.C. § 753(b)(1), and concluding "failure   to   record   all   proceedings   verbatim   does   not   necessarily   require

---

[9]  Petitioner's Ground 3 also raises the equal protection argument which is herein above found to be procedurally defaulted.

[10]  The Arizona Court of Appeals noted the prosecution's argument that there was an absence of prejudice, and discussed the lack of any demonstrated prejudice.  (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 18.)  The Court went on, however, to discuss the merits of the attack on the rule, noting the option for a request for certified transcripts, and the absence of any such request by Petitioner.  (*Id.* at 19-20.)  Regardless whether that amounted to a rejection based upon a lack of prejudice, the undersigned finds the claim is without merit because of the lack of prejudice.

reversal...[r]ather, the defendant must demonstrate 'specific prejudice' resulting therefrom").

Petitioner fails to proffer any prejudice from the errors. The only errors identified to the state court were "several examples of typographical errors found in the rapid transcript of his trial, including 'planes in the jury box,' 'Noel Gato,' and 'contents of the nurse.'" (Pet. Exhibit 3, Mem. Dec. 3/27/03 at 18. *See also* Pet. Exhibit 1A, Opening Brief at 15.) The meaning of the cited passages is evident to the undersigned. Moreover, none of the cited passages has been shown to have had any real impact on any defenses available to Petitioner.

The "planes in the jury box" comment appears in opening remarks by defense counsel as he restarted his closing argument from the day before, after an interruption by a fire alarm and resulting recess:

> May it please the Court, Counsel, ladies and gentlemen. Good morning.
> As we were forced out of the courtroom yesterday afternoon, I felt a little bit like Nero playing his fiddle as Rome burned to the ground. I was so focused on my argument that it probably would have taken *planes in the jury box* to get my attention.
> Hopefully today will be less exciting, and we will be able to complete the presentation of the case and turn it over to you for your decision.

(Exhibit T, R.T. 10/19/00.) It is not apparent that the word was "flames" as opposed to "planes", either of which would have been consistent with counsel's explanation of his lack of attention to the alarm. Moreover, this passage has not been shown to be relevant to any defense or claim by Petitioner.

The "Noel Gato" reference clearly related to the only "Gato" referenced throughout the proceeding, the missing gunman. This "error" arose during examination of Don Mecham about his knowledge of Alfredo Munoz, "El Gato."

> Q. Did you ever know a person with the nickname El Gato?
> A. No, I don't. Nope.
> Q. Did you know an Alfonso Munoz?
> A. I think so, yes.
> Q. But you didn't know him as El Gato?

A. No.

Q. You didn't know him as being an undocumented alien from Mexico?

A. Nope.

Q. When the one you knew went to high school with you?

A. Yeah. He went to high school with me, he looked familiar.

Q. The name?

A. Yeah. I went to high school with Lopez. Some, Robert Lopez or something.

Q. Oh. Anyway, Noel Gato?

A. No.

(Supp. Exhibit M, R.T. 10/5/00 at 59.) Thus, it appears the transcript should have read "Oh. Anyway, no El Gato?" Petitioner does not suggest that any ambiguity in this transcription impacted an available defense.

Finally, the references to the "contents of the nurse" was a plain reference to the victim's purse then under discussion. On direct examination, Detective Stewart had identified an exhibit as the purse in the victim's car:

Q. Showing you exhibit 54, did you examine that purse and obtain that purse in evidence?

A. Yes.

Q. Okay. I show you exhibit four for identification. And ask if you can identify that.

A. You want me to take it out of the bag, or

Q. By looking in the bag, can you identify it?

A. Yes, sir, appears to be the purse that I took from the passenger side of the vehicle.

Q. Front?

A. Yes, sir.

Q. July 3 of '97?

A. Yes, sir.

Q. Same purse?

A. Yes, sir.

Q. Okay.

MR. LEVY: Move exhibit four.

MR. ROSS: One quick question on voir dire, Your honor.

VOIR DIRE EXAMINATION

BY MR. ROSS:

Q. Detective Stewart, did you examine the *contents of the nurse* this morning to compare them to the contents of the purse when it was seized?

A. No, Your Honor.

(Supp. Exhibit O, R.T. 10/11/00 at 46.)

Further, having reviewed the transcripts in this case, the Court finds them to contain no more apparent typographical or transcription errors than many manually prepared transcripts.

The claim is without merit.

## G.  ACTUAL INNOCENCE

### 1.  Standard for Actual Innocence

The undersigned has concluded that absent a showing of actual innocence, the equal protection claim in Ground 3, and the claims in Grounds 4, 5, 6, and 7 must be dismissed with prejudice as procedurally defaulted or procedurally barred.   All other claims have been deemed to be without merit.

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances.   *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).   Failure to establish cause may be excused under exceptional circumstances.  For instance:

> .... in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of showing cause for the procedural default.

*Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *House v. Bell,* 547 U.S. 518, 537 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  "[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. *Id.* at 538 (internal quotations omitted).

//

//

//

## 2. Avoidance of Actual Innocence Determination

Congress has recognized that denying a habeas petition on its merits may, at times, be more efficient that fully resolving the exhaustion issues. Thus, 28 U.S.C. § 2254(b)(2) provides: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Accordingly, the court is free to side step the exhaustion issue when it is more efficient or easier to dispose of a claim on its merits. *Cassett v. Stewart*, 406 F.3d 614, 623-624 (9th Cir. 2005). The same approach is appropriate where the state has asserted that the claim is procedurally defaulted or procedurally barred.

> We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law. Cf. 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies).

*Lambrix v. Singletary,* 520 U.S. 518, 525 (1997). *See also Clark v. Rickets*, 958 F.2d 851, 857 (9th Cir. 1991) (considering merits of claims arguably barred under Arizona procedural bars).

In taking this approach, the habeas court does not simply address the merits of the unexhausted, procedurally defaulted, or procedurally barred claim. Rather, in furtherance of the interests of federalism and comity underlying the procedural default and procedural bar rules, the "federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassette*, 406 F.3d at 624.

Here, the undersigned might be able to conclude that some of Petitioner's procedurally defaulted and procedurally barred claims are plainly without merit, and fail to assert a colorable federal claim.

For example, Ground 3 asserts an equal protection claim but Petitioner fails to allege in prejudice.

In Ground 4, Petitioner asserts a confrontation claim based upon the admission of various hearsay, but in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court analyzed the history of the Confrontation Clause and concluded that its "core concerns" were not with simple hearsay, but with out-of-court *testimony*, whether in a separate judicial proceeding or a police investigation. *Id.* at 51. Two years later, in *Davis v. Washington*, 547 U.S. 813 (2006), the Court revisited the scope of the Confrontation Clause, and held that its focus on testimonial evidence was a "limitation so clearly reflected in the text of the constitutional provision [that it] must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* at 824. Just this past year, the Court again addressed the issue and held that non-testimonial evidence "is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, - - - U.S. - - - , 131 S.Ct. 1143, 1155 (2011).

In Ground 7, Petitioner complains of omitted transcripts, but fails to assert any prejudice.

On the other hand, although not convinced of their merits, the undersigned cannot say that Petitioner's Grounds 5 (actual innocence)[2] and 6 (ineffective assistance) fail to "raise even a colorable claim." The merits of both turn upon the evaluation of the impact of Petitioner's new evidence, and neither is plainly without merit.

Accordingly, this Court must evaluate whether Petitioner's new evidence will permit him to pass through the *Schlup* gateway for actual innocence.

//

//

---

[2] "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding...This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400-401 (1993). However, the Ninth Circuit has concluded that *Herrera* does not foreclose the potential for a free-standing claim of actual innocence, but has also concluded that any such claim would have to be based upon "affirmative proof of actual innocence based on newly discovered evidence." *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002

**3. New Evidence of Actual Innocence**

Petitioner argues his actual innocence, relying upon evidence from his experts that, contrary to the prosecution's evidence at trial, a "single assailant could not have hid in the back seat, shot the deceased in the front seat, then climbed over the seat and exited through the passenger door without leaving blood smears or other evidence." (Amend Pet., Doc. 12 at 10.) Petitioner argues that this amounts to a showing of actual innocence and excuses his procedural defaults. (Reply, Doc. 20 at 27.)

Petitioner relies upon Isidro (Indio) Falcon's recounting to police of Alfonso Munoz's (El Gato) purported description of the murder.

> Indio told me that a day or two later Gato again contacted him at his apartment. On this occasion, Indio told me that Gato told him how the murder occurred. Indio said Gato told him that he drove to the area in the brown car. Using the keyless remote he entered the victims [sic] car. Once inside, Gato lay on the rear floorboard and covered himself with a coat.
>
> The victim entered the car and started it. The victim began backing out of the driveway, and in doing so looked behind her at which time she observed Gato. The victim begins screaming and it is at this point that Gato shoots her twice in the head. According to Indio, Gato told him that one shot grazed the victim and the other struck her in the head. The car continues in reverse at which time Gato tries to get out of the car. The car which has automatic locks prevents him from getting out. Gato tries to kick out a window without success, then reaches to the ignition switch and presses the keyless remote control device on the victims [sic] key ring which unlocks the doors. Gato then runs from the area.

(Supp. Exhibit A, PCR Memo, Exhibit 9, Incident Report Supplement at "49".)

In contrast, Petitioner presented parallel affidavits of criminal reconstructionist Frank Rodgers, forensic scientist William Collier, and forensic consultant Dr. Thomas Streed that based upon personal examination of the vehicle, and the photographs and other information supplied that:

> any person who exited the vehicle from the rear passenger compartment though the front passenger door would have necessarily created blood smears and blood transfer patterns. The blood transfer on the rear door panel demonstrates that the shooter did have blood deposited on his hand or gloved hand. That hand

76

would have had to be used to maneuver out through the front passenger compartment and a transfer such as the one seen on the rear door panel created. The absence of transfer or smear pattern makes it extremely unlikely that any person exited the rear passenger compartment area through the front door after the victim had been shot.

(Supp. Exhibit A, PCR Memo, Common Declarations.)[3]

Respondents point out that Falcon was prohibited from relating Munoz's description of the murder under hearsay rules. The parties argue whether the lack of trial testimony by Falcon about the description given by Munoz renders the purported discrepancy in that description irrelevant. However, actual innocence determinations are not limited by the niceties of evidentiary law nor some hypothetical trial scenario. Rather, the question is whether, armed with the new evidence, Petitioner has made a sufficient showing that a reasonable juror armed with all the evidence would have failed to convict.[4]

Concealment - Petitioner's experts noted that Frank Rodgers unsuccessfully attempted to conceal himself in the backseat of the vehicle. But, they also noted that Rodgers was 5' 10" tall, 180 pounds. (Supp. Exhibit A, PCR Memo, Common Declarations.) In contrast, testimony at trial by neighbor Benny Hays indicated that the person seen running from the scene was "five seven to five nine," and "looked like he weighed about maybe 150 to 170." (Supp. Exhibit I, R.T. 9/27/00 at 59.) The description given to police was "five-six, 160 pounds". (Supp. Exhibit L, R.T. 10/4/00 at

---

[3] Petitioner's experts noted that Frank Rodgers unsuccessfully attempted to conceal himself in the backseat of the vehicle. But, they also noted that Rodgers was 5' 10" tall, 180 pounds. (Supp. Exhibit A, PCR Memo, Common Declarations.) In contrast, testimony at trial by neighbor Benny Hays indicated that the person seen running from the scene was "five seven to five nine," and "looked like he weighed about maybe 150 to 170." (Supp. Exhibit I, R.T. 9/27/00 at 59.) The description given to police was "five-six, 160 pounds". (Supp. Exhibit L, R.T. 10/4/00 at 96.) The width of the back seat was 59 inches. (Supp. Exhibit A, PCR Memo, Common Declarations.) Petitioner's experts offer no opinion that the difference in size was not sufficient to permit Falcon to conceal himself in the manner related by Falcon.

[4] Even if the prosecution would have been prohibited from introducing Falcon's recitation, and thus no impeachment made possible, Respondents have not foreclosed the possibility that the defense could have nonetheless impeached Falcon by introducing his statements to the police on the recitation, and contrasting it with the new evidence.

96.) The width of the back seat was 59 inches. (Supp. Exhibit A, PCR Memo, Common Declarations.) Petitioner's experts offer no opinion that the difference in size was not sufficient to permit Falcon to conceal himself in the manner related by Falcon.

Exit Path – Petitioner's experts also suggest that the gunman could not have exited through the front passenger door. Petitioner's experts' opinions would make it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" if: (1) the jury were required to believe Isidro Falcon on this point to convict; and (2) the jury were required to assume that the shooter had exited through the front passenger door of the car to believe Isidro Falcon.

With regard to the credibility of Isidro Falcon, his testimony was a key part of the prosecution's case. However, there was other evidence that Petitioner had obtained the death of the victim, *i.e.* the evidence that Petitioner had attempted to purchase her death from Doug Maurer, Colin Head, and had attempted to hire William Moore to kill Falcon to cover it up.

Doug Maurer testified that Petitioner had discussions with him about ways Petitioner could kill his wife, offered to hire Maurer to kill his wife with a knife in Las Vegas, and offered to hire Maurer to kill her with a gun at their home, going so far as to give the gun to Maurer. (Supp. Exhibit J, R.T. 10/2/00 at 15-26.)

Maurer's testimony was corroborated by testimony from Tammy Goad-Maurer that: she had seen Doug Maurer with a gun (Supp. Exhibit M, R.T. 10/15/00 at 128-129); that she and Danny Maurer had told Petitioner prior to the murder that Doug Maurer was claiming that Petitioner was trying to get his wife killed (*id.* at 130-132)[5]; and Petitioner had complained to her that Maurer had stolen his gun, but Petitioner declined to report it (*id.* at 135-136).

---

[5] This testimony about the conversation between Goad and Petitioner was not presented to the jury, but was taken as part of an offer of proof. Nonetheless, this Court must consider it in making its actual innocence determination. *House*, 547 U.S. at 538.

Further, Deputy Baker's contact of Detective Lopez and their subsequent interview of Maurer, corroborated Maurer's testimony that he had approached Baker about the murder plot.

Colin Head testified that Petitioner had asked him to murder the victim while she was in California, and had related that story to the police. (Supp. Exhibit M, R.T. 10/5/00 at 38-39.)

William Moore testified that in February, 1997, Petitioner had asked Moore about having somebody "disappear." (Supp. Exhibit L, R.T. 10/4/00 at 26-27.) He testified that in December, 1997 Petitioner told him about rumors of him hiring Falcon to kill the victim, and when asked Petitioner said he couldn't have just divorced her because he would have lost everything. Petitioner expressed concern that he was going to be arrested if Falcon was arrested, and asked Moore if he knew someone from Nevada who would kill Falcon, for $10,000 to be split between Moore and the killer. (*Id.* at 37, 43-45.)

The nature of the murder as a "hit," rather than a robbery, sexual assault, car-jacking or similarly motivated killing, is reflected by the fact that the victim's purse was not taken, evidence that the shooter was in the back seat and lying in wait, that the car was not taken, that lack of evidence of a forced entry, and the limited time elapsed between the victim entering the car and the murder.

Thus, a reasonable juror could have concluded that, even without any belief in Falcon's testimony, Petitioner had finally succeeded in procuring the victim's death.

Further, the evidence does not require an assumption that a reasonable juror would have had to disbelieve Falcon's accusations in the face of the new evidence provided by Petitioner's experts.

Agreement on the open door is not necessary to Falcon's credibility.

Falcon never claimed Munoz exited from the front passenger door. (See Supp. Exhibit A, PCR Memo, Exhibit 9, Incident Report Supplement at "49".)

To be sure, neighbor Benny Hays testified that when he approached the scene, the only door of the car open was the front passenger door.

Q    And was the engine on or off?

A    There was not - - no engine running when I got there.

Q    And you saw a woman slumped over in the driver's seat?

A    I seen a lady in there, yes, uh-huh.

Q    Did you see any doors open?

A    The passenger side door was open.  That was the only door that was.

Q    Front or rear?

A    The front.

Q    Is that the only door open?

A    Yes, sir.

(Supp. Exhibit I, R.T. 9/27/00 at 61-61.)  (*See also id.* at 73.)

Similarly, Officer Stephaniak testified that she was the first responding officer, and when she arrived the front passenger door was open.  (Supp. Exhibit I, R.T. 9/27/00 at 89, 91, and 93.)

However, Hayes also testified that he was summoned to the scene by a neighbor, Henry or Hank Watson, who reported "there's a lady down here in the car that went through a short block fence and she's hurt."  (Supp. Exhibit I, R.T. 9/27/00 at 58. *See also id.* at 69)  Mr. Watson did not testify.

A reasonable juror could easily reconcile the accounts by concluding that Munoz had closed the rear door after exiting, and that Mr. Watson had opened the passenger door in order to determine that the victim was hurt, before Watson went to summon Hays.  Or even that Munoz had exited from and closed the rear door, and then opened the passenger door for some other reason (*e.g.* in a moment's hesitation of whether to take the purse, to assure himself the victim was dying or dead, etc.).

Indeed, all of the physical evidence suggested that the shooter had been in the back seat, e.g. the victim's injuries, the bullet hole in the windshield, the casings and car remote in the backseat, the key to Falcon's car being in the floorboard, and the shoe prints in the back seat.  Because Petitioner's experts establish that climbing through to the front seat was impossible, in order to discount Falcon's recitation of events, a juror would have to reconstruct the position of the shooter as being in the front passenger seat,

solely to explain the open door, and thereby ignoring the other evidence that the shooter he was in the back seat.

Alternatively, a reasonable juror could simply conclude that the facts between Munoz and Falcon had simply gotten convoluted, and that Falcon was faithfully recounting all of his experiences, including Munoz's recitation of his actions, and thus any deficit in credibility did not lie with Falcon.

A reasonable juror could even adopt the argument posited by Petitioner in his PCR proceedings that there were two assailants, one in the front and one in the back, and reconcile it with the other evidence by concluding that Munoz had an accomplice of whom Falcon was unaware.

Thus, the door discrepancy would not have precluded belief in Falcon's core accusations of Petitioner having paid him (and he Munoz) to kill the victim, and their combined accomplishment of the task.

Moreover, there was substantial corroboration of Falcon's story, including the recovery of the jacket, car remote, and key to Falcon's car from the back seat of the victim's vehicle, the bullet hole in the windshield, the description of the man running from the scene, the victim's injuries, Colin Head's delivery of an envelope to Falcon after the murder, Munoz's existence and disappearance after the murder, Catalina's picking Munoz up after the murder, and Mecham's having taken Falcon to get the vehicle after the murder. With all of that corroboration, a reasonable jury could conclude that the essentials of Falcon's story were true, even if his recitation of the murder scene was inaccurate or even fabricated.

Thus, a reasonable juror could have still convicted Petitioner in the face of a discrepancy over the particulars of the execution of the killing.

In sum, even with Petitioner's new evidence, the undersigned cannot find it more likely than not that no reasonable juror could have found Petitioner guilty beyond a reasonable doubt.

/ /

/ /

### 3. Conclusion re Actual Innocence

Based upon the foregoing, the undersigned concludes that Petitioner has failed to establish his actual innocence, and thus may not be relieved of the consequences of his procedural defaults and procedural bars.

### M. SUMMARY

Petitioner's federal claims in Grounds 1 (Vagueness), 2 (*Apprendi*) and his due process claim in Ground 3 (Rapid Transcript) were properly exhausted, but are without merit, and must be denied.

Petitioner failed to properly exhaust his state remedies on the federal claims in his equal protection claims in Ground 3 (Rapid Transcript), and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), and 7 (Omitted Transcript), and is now procedurally barred from doing so. Petitioner's Ground 6 (Ineffective Assistance) was procedurally barred by the state courts under on an independent and adequate state ground. Petitioner has failed to show cause and prejudice or actual innocence to avoid that procedural default, and these claims must be dismissed with prejudice.

### IV. CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment. The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner. Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be in part on procedural grounds, and in part on the merits.

To the extent that Petitioner's claims are rejected on procedural grounds, under the reasoning set forth herein, the undersigned finds that "jurists of reason" would not "find it debatable whether the district court was correct in its procedural ruling."

To the extent that Petitioner's claims are rejected on the merits, under the reasoning set forth herein, the constitutional claims are plainly without merit.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.


## V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the equal protection claims in Ground 3 (Rapid Transcript), and the claims in Grounds 4 (Hearsay), 5 (Actual Innocence), 6 (Ineffective Assistance), and 7 (Omitted Transcript) of the Petitioner's

Amended Petition for Writ of Habeas Corpus, filed March 3, 2010 (Doc. 12) be **DISMISSED WITH PREJUDICE**.

　　**IT IS FURTHER   RECOMMENDED** that the remainder of Petitioner's Amended Petition for Writ of Habeas Corpus, filed March 3, 2010 (Doc. 12), including Grounds 1 (Vagueness), 2 (*Apprendi*) and the due process claim in Ground 3 (Rapid Transcript) be **DENIED**.

　　**IT IS FURTHER RECOMMENDED** that to the extent the reasoning of this Report & Recommendation is adopted, that a certificate of appealability **BE DENIED**.

## V. EFFECT OF RECOMMENDATION

　　This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

　　However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Pursuant to *Local Civil Rule 7.2(e)(3)*, unless otherwise permitted by the Court, an objection to a Report and Recommendation shall not exceed ten (10) pages.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the

recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: January 30, 2012

James F. Metcalf
United States Magistrate Judge